497 So.2d 1245 (1986)
Captain David RABREN and Tampa Tri-County Pilots Association, Appellants,
v.
BOARD OF PILOT COMMISSIONERS and Department of Professional Regulation, Appellees.
Captain Gary MURPHY, Captain Stephen Cropper, and Captain Michael Farrell, Appellants,
v.
BOARD OF PILOT COMMISSIONERS and Department of Professional Regulation, Appellees.
No. BF-89.
District Court of Appeal of Florida, First District.
August 27, 1986.
Rehearing Denied November 7, 1986.
*1246 H. Glenn Boggs, Tallahassee, and J. Michael Shea, Tampa, for appellants.
Jim Smith, Atty. Gen., and John E. Griffin, Asst. Atty. Gen., Tallahassee, for appellees.

REVISED OPINION
SHIVERS, Judge.
Upon consideration of the motion for rehearing filed by appellee Board of Pilot Commissioners, we deny the motion for rehearing but revise and substitute the following opinion.
Captain David Rabren, Tampa Tri-County Pilots Association, Captain Gary Murphy, Captain Stephen Cropper, and Captain Michael Farrell appeal an order of the Division of Administrative Hearings denying their challenge to Florida Administrative Code Rule 21SS-8.10. We reverse.
In 1975 the Legislature established the Board of Pilot Commissioners within the Division of Professions of the Department of Professional Regulation. Section 310.001, Florida Statutes, empowered the Board to perform such duties and exercise such powers to protect the waters, harbors and ports of the State as are conferred by Chapter 310, Florida Statutes. Section 310.141, Florida Statutes (1975) provided that:
All vessels, except vessels exempted by the laws of the United States or vessels drawing less than 7 feet of water, shall have a licensed state pilot or certificated deputy pilot on board when entering or leaving ports of this state... .
Vessels exempted by the laws of the United States from the requirement that they take on state-licensed pilots are U.S. ships described in 46 U.S.C. § 8502. The State may not level piloting charges on coastwise vessels. Vessels "plying coastwise" are those engaged in domestic trade. The only vessels which states may require State pilots to operate are foreign vessels.
On June 11, 1984, Captain Valenti, United States Coast Guard Captain of the Port of Tampa, notified the Board of Pilot Commissioners (the Board) that certain pilots in Tampa Bay were claiming that neither the State of Florida nor the Coast Guard had jurisdiction to regulate shifting activities in Tampa Bay (moving ships from one place to another).
Acting pursuant to sections 310.001 and 310.141, Florida Statutes, the Board promulgated *1247 Rule 21SS-8.10, Florida Administrative Code, to deal with shifting activities in Tampa Bay. Rule 21SS-8.10 reads as follows:
Any vessel requiring a state pilot that is underway on the navigable waters of the State of Florida shall have a state pilot aboard except when in the docking or undocking mode. Docking or undocking mode is when the tugs are alongside and the vessel is under the direction of the master, docking master, or state pilot or deputy pilot.
The State, if it elected to do so, could regulate pilots in their shifting activities in Tampa Bay. Section 8501(a), 46 U.S.C., provides that, except as otherwise provided, pilots in bays, inlets, rivers, harbors and ports of the United States shall be regulated or in conformity with the laws of the States.
Appellant Capt. Rabren holds both a state pilot's license and a federal pilot's license. Appellants Capts. Murphy, Cropper and Farrell hold only federal pilots' licenses. Capt. Rabren and the other captains are all members of Appellant Tri-County Pilots Association. They maintain that Rule 21SS-8.10 wrongfully prevents those who do not have Florida pilot licenses from shifting foreign vessels from port to port in Tampa Bay. They contend that once a foreign vessel enters Tampa Bay it comes under the U.S. Coast Guard; that a non-licensed pilot should be able to pilot it around in Tampa Bay, which they argue is just one big port; and that the vessel should be required to have a state-licensed pilot only when it is "entering" or "leaving" Tampa Bay.
The hearing officer found, and we feel correctly, that Tampa Bay is not just one port. Port is statutorily defined:
310.002 Definitions.
As used in this act:
(4) The word "port" means any place in the state into which vessels enter or depart and includes, without limitation, Fernandina, Nassau Inlet, Jacksonville, St. Augustine, Canaveral, Ft. Pierce, West Palm Beach, Port Everglades, Miami, Key West, Boca Grande, Charlotte Harbor, Punta Gorda, Tampa, Port Tampa, Manatee, St. Petersburg, Clearwater, Apalachicola, Carrabelle, Panama City, Port St. Joe, and Pensacola.
Section 310.061, Florida Statutes, specifically names four of the ports in Tampa Bay:
310.061 Provision for licensing state pilots.
(1) There shall not be more than 3 pilots for the Port of Pensacola; 3 for the Port of Fernandina and Nassau Inlet; 16 for the St. Johns River, including the Port of Jacksonville; 22 for Tampa Bay, including the Ports of Tampa, Port Tampa, Manatee, and St. Petersburg; 4 for the Ports of Punta Gorda, Charlotte Harbor, and Boca Grande, inclusive; 3 for the Port of Panama City; 3 for the Port of Key West; 3 for the Port of Palm Beach; 3 for the Port of Ft. Pierce; 4 for the Port of Port Canaveral; 14 for the Port of Miami; 10 for the Port of Port Everglades; 3 for the Port of Port St. Joe; and 2 for any port not specifically mentioned in this chapter. Nothing herein shall be construed to require the appointment of the maximum number of pilots authorized for any port.
(2) The Board shall determine the number of pilots in conformance with subsection (1) based on the supply and demand for piloting services and the public interest in maintaining efficient and safe piloting services.
We affirm the Hearing Officer's finding that there exist four separate ports in Tampa Bay.
Section 310.002, Florida Statutes, defines "pilotage waters of the state":
310.002 Definitions.
As used in this act:
(5) The term "pilotage waters of the state" means the navigable waters within the boundaries of the state.
*1248 F.A.C. Rule 21SS-8.10 would require a state pilot on a vessel that is underway on the navigable waters of the State of Florida, except when docking or undocking. The statute, section 310.141, requires a state-licensed pilot on board "when entering or leaving ports of this state." When the legislation on this was introduced, House Bill 1358 proposed this language for section 310.14, Florida Statutes (now 310.141, Florida Statutes):
All vessels, except vessels exempted by the laws of the U.S., shall when entering or leaving ports of this state or when operating in pilot waters of this state, at all times have on board a licensed state pilot or certificated deputy pilot for the port or waters in question. (emphasis added)
House Bill 1358, thus, contained the language "or when operating in pilot waters of the state." However, when the bill was passed into law and became section 310.141 it did not contain the words "or when operating in pilot waters of the state." Since these words, which section 310.002, Florida Statutes, defines as "navigable waters within the boundaries of the state" were omitted, we are required to note the significance of the omission.
In the instructional Florida State Supreme Court case of State ex rel. Finlayson v. Amos, 76 Fla. 26, 79 So. 433 (1918), petitioner, owner of a 32 horsepower automobile with a seating capacity of one and not more than five persons applied, under Chapter 7275, Acts of the Legislature of 1917, to have his automobile registered in accordance with law. The comptroller refused to do so, maintaining that the registration fee was $12, not $5 and that he had to have $7 more before registering the car. The issue presented was the construction to be placed on series B and C of section 6 of the automobile license act of 1917, that read in part:
The following fee shall be paid to the comptroller upon the registration or reregistration of motor vehicles in accordance with the provisions of this act.

 Passenger Vehicles
Series A  Motorcycles _____________________________________________ $ 2.00
Series B  For any automobile and other motor driven vehicle with
 a seating capacity of one and not more than five
 persons _________________________________________________ 5.00
Series C  Automobiles of more than 25 h.p., and not more than 40
 h.p. ____________________________________________________ 12.00
Series D  Automobiles of more than 40 h.p., and not more than 60
 h.p. ____________________________________________________ 15.00
Series E  Automobiles of more than 60 h.p. ________________________ 30.00
Any type of automobile seating ten or more passengers ______________ 100.00

Petitioner asserted that since his automobile had a seating capacity of not more than five persons, he should pay a fee of $5 as provided for in Series B. The comptroller maintained that since the automobile had more than 25 horse power and not more than 40, the petitioner was required to pay a fee of $12. The Florida Supreme Court, speaking through Justice Brown, wrote that due to the conflicting provisions of that law, the court could seek light in the history of the passage of the act through the Legislature. Justice Brown referred to Lewis' Sutherland on Statutory Construction § 470:
The proceedings of the Legislature in reference to the passage of an act may be taken into consideration in construing the act. Thus the reports of committees made to the Legislature have been held to be proper sources of information in ascertaining the intent or meaning of the act. Amendments made, or proposed and defeated, may also throw light on the construction of the act as finally passed, and may properly be taken into consideration.
In the Amos case, when the Senate Bill passed the Senate and went to the House, series B read "Automobiles of not more than 25 h.p. $7.00." In the House an amendment was adopted to strike out the words "automobiles of not more than 25 h.p. $7.00" and insert in lieu thereof the following: "For any automobile and other motor-driven vehicle with a seating capacity of one and not more than five persons $5.00." This amendment was then rejected *1249 in the Senate, but later considered by a conference committee composed of members from both houses, and thereafter adopted by the Senate upon recommendation of the conference committee. Justice Brown noted that the ruling of the comptroller would nullify the amendment and restore to the bill that part of it which the Legislature rejected. The supreme court held:
... If the amendment had not been adopted, the comptroller's interpretation would be correct, but he ignores the amendment, and interprets the law as if it had passed as originally introduced in the Senate. There is no authority for a department of the government charged with the execution of a law, to restore a provision which the Legislature strikes from the act when in progress of its passage. Whatever the Legislature does within its constitutional authority, no other department of the government may change, modify, alter, or amend.
It seems quite clear to us that, when the Legislature struck from the act under consideration, as originally introduced, language identical with the construction now placed upon series B by the comptroller, the Legislature in the clearest and most positive manner showed its disapproval of his construction, and this court must enforce the clearly expressed legislative will.
We therefore find that series B of section 6 of chapter 7275, Acts of 1917, provides for a license tax of only $5 on any automobiles or other motor-driven vehicles, with a seating capacity of one and not more than five passengers, without regard to horse power.
We conclude that the Board's rule is not one permitted by the statute, and is overbroad.
The legislative history of the statute in the case sub judice reveals that the Legislature refused to adopt statutory language approximately equal to the language in the rule. The Board had no authority to, in effect, amend the statute to do what the Legislature refused to do. The statute without the rule gives no authority to the State to require a licensed state pilot or certificated deputy pilot on board except when in the docking or undocking mode, on any vessel requiring a state pilot that is underway on the navigable waters of the state.
Section 310.141, Florida Statutes, requires state-licensed pilots on foreign vessels entering or leaving the ports of the state. Since Tampa Bay consists of at least four ports, section 310.141 may already apply to shifting activities in Tampa Bay.
The Legislature has the authority to require pilots in its bays, inlets, rivers, harbors and ports, but it cannot be done by rule when the Legislature has refused to broaden the requirement. We conclude that Rule 21SS-8.10, Florida Administrative Code, is an invalid exercise of delegated legislative authority.
REVERSED.
MILLS, J., concurs.
ZEHMER, J., dissents, with written opinion.
ZEHMER, Judge, dissenting.
I would uphold the validity of the challenged rule because it can be permissibly construed by the Board of Pilot Commissioners and Department of Professional Regulation as requiring a state licensed pilot aboard a vessel incident to entering and leaving ports of this state, and this construction falls well within the language and intent of section 310.141, Florida Statutes (1983). I do not agree that the rule must be construed to "require a state pilot on a vessel that is underway on the navigable waters of the State of Florida, except when docking or undocking". (Opinion, p. 4.), in the sense that such pilot must be aboard whenever a vessel is moved in any state "navigable waters," regardless of the purpose of movement. The majority's construction of the rule is, in my opinion, unnecessarily overbroad because it ignores the phrase that limits the rule's application *1250 to "any vessel requiring a state pilot," which, by statutory requirement, means a state pilot must be aboard only when the vessel is in the bays, harbors, rivers, and ports incident to entering or leaving ports of this state. Nor do I agree that the rule must be construed as having a broader meaning and application than the organic statute because the phrase "or when operating in pilot waters of this state" was deleted from the statute just prior to enactment in 1975.

I.
Addressing this issue, the hearing officer stated in his order:
Petitioners place their greatest emphasis in this rule challenge on the statutory language in which the Legislature requires state licensed pilots on all vessels, except those exempted by the laws of the United States, while entering or leaving ports of this state. It is contended the rule language, that prescribes a state pilot be carried on any vessel requiring a state pilot that is underway on the navigable waters of the state, is in conflict with the statute. To bolster this position, Petitioners refer to the language in proposed legislation that was rejected when Section 310.141, Florida Statutes (1975), was enacted. The proposed language requiring state licensed pilots included in the requirement vessels "operating on the pilot waters of the state." This phrase was deleted and, as enacted in 1975, vessels subject to pilotage were the same as they are today.
Petitioners contend that by deleting "pilot waters of this state" from the requirement the Legislature intended only to require state pilots on vessels entering or leaving ports of the state. Petitioners also refer to legislation proposed in 1976 and 1977 which introduced the phrases "pilot waters of the state" and "navigable waters of the state" as those areas requiring state pilots. Petitioners argue that by failure to pass this language the Legislature intended to strictly limit the requirement for a state pilot only on foreign flag vessels entering or leaving a port in this state.
A better reason for deleting the phrase "pilot waters of the state" from the 1975 legislation may be found in Section 310.002, Florida Statutes (1975), which provides:
(5) The term `pilotage waters of state' means the navigable waters within the boundaries of the state.
This definition includes the high seas within the boundaries of the state. United States laws guarantee the right of innocent passage to foreign flag merchant vessels in these waters and preclude the state from requiring these vessels to take pilots while on the high seas. 46 USCS § 8502, above quoted, limits state regulations on pilotage to bays, rivers, harbors, and ports. 46 USCS § 8304 provides:
... `high seas' means water seaward of the Boundary Line.
The Boundary Line divides the waters in which Inland and International Rules of the Road apply. This boundary line is established by the Commandant, U.S. Coast Guard and, in the vicinity of a port, generally runs from the entrance sea buoy towards the nearest prominent landmark north and south of the entrance sea buoy.
Accordingly, little weight is given to the omission of either phrase "pilot waters of the State" or "navigable waters of the State" from the statute providing which vessels are required to take a state pilot. The phrase used "except vessels exempted by the laws of the United States" is a more accurate description of the vessels that may be required to take state pilots in bays, harbors, rivers, and ports of a state.
Section 310.001, Florida Statutes (1983), provides it is the legislative intent to regulate pilots and pilotage on navigable waters of this state in order to protect the resources, environment, life, and property to the fullest extent possible.
Rule 21SS-8.10, Florida Administrative Code, is a simplistic rule that states *1251 any vessel requiring a state pilot shall, while underway, have such pilot on board, except when in the docking or undocking mode. It does not conflict with Section 310.141, Florida Statutes, which requires a state pilot on all vessels entering or leaving a port, except those vessels exempted by United States law and vessels drawing less than seven feet of water.
The strictest interpretation of this rule, if necessary to conform to the statute, would result in state pilots being required on all foreign flag vessels leaving any of the ports in Tampa Bay or entering any of the ports in Tampa Bay either from an anchorage or a mooring facility if such a facility is located outside any of the four ports in Tampa Bay.
It is somewhat incongruous to hold the state has plenary power to require state pilots on foreign flag vessels entering or leaving Tampa Bay but is without any authority to require state pilots on those vessels after they clear customs and proceed through the channels of Tampa Bay. This is especially true when the legislative intent is clearly expressed to require state pilots on foreign flag vessels so as to protect the resources, environment, life, and property of the state and its citizens to the fullest extent possible. Those vessels moving through congested channels of Tampa Bay pose the same threat to life, property, etc. whether entering or leaving a port or shifting anchorages.
Where, as here, the agency's interpretation of a statute has been promulgated in rulemaking proceedings, the validity of such rule must be upheld if it is reasonably related to the purposes of the legislation interpreted and is not arbitrary and capricious. The burden is on the petitioner in a rule challenge to show by a preponderance of the evidence that the rule or its requirements are arbitrary and capricious. Department of Professional Regulation, Board of Medical Examiners v. Durrani, 455 So.2d 515, 517; Agrico Chemical Co. v. State Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1978); Florida Beverage Corp. v. Wynne, 306 So.2d 200 (Fla. 1st DCA 1975). Moreover, the agency's interpretation of a statute need not be the sole possible interpretation or even the most desirable one; it need only be within the range of possible interpretation. Durrani, supra, at p. 517.
In the instant rule challenge the statute clearly requires a state pilot on foreign flag vessels entering and leaving a port. This would cover any vessel movement within Tampa Bay which commenced or terminated at any of the four ports within Tampa Bay, with the exception of vessels in the docking or undocking mode. If Respondent interprets the rule to require a state pilot on foreign flag vessels moving between anchorages in Tampa Bay where none of the ports is involved, this would constitute a reasonable interpretation of the statute to require state pilots on foreign flag vessels in Florida ports for the protection of the environment, life, property, and resources of the state and the citizens thereof.
From the foregoing it is concluded that Petitioners have failed to prove, by a preponderance of the evidence, that Rule 21SS-8.10, Florida Administrative Code, is an invalid exercise of delegated legislative authority.
(R. 90-94) I agree with the hearing officer's findings and find no error in his reasoning and conclusions of law.

II.
The hearing officer's findings of fact are supported by competent, substantial evidence, and I detect nothing in the record that would require this court to repudiate the hearing officer's conclusion that "shifting" operations in Tampa Bay may be legally regulated under the present language of section 310.141. I fully agree with the majority opinion that there are several ports in Tampa Bay. I likewise agree with the majority opinion that the state has authority to regulate "shifting" activities of *1252 vessels in Tampa Bay. There is, however, no competent evidence in the record to show that, in admiralty parlance and under the custom of the shipping industry, "shifting" of ships in the manner described in this case does not constitute an integral part of entering and leaving a port of this state. Since all vessels affected by the rule must be, by definition, engaged in foreign commerce, the only reason for such vessels to be involved in "shifting" activity in Tampa Bay would be to facilitate entry to or exit from the ports on the bay. Temporarily stopping at an anchorage while entering or leaving the harbor or bay does not change the dominant purpose for which the vessel is in Tampa Bay, i.e., to enter ports and discharge cargo, or to take on cargo and leave the port for the high seas.
As the parties challenging the validity of the rule, appellants bore the burden of proving before the hearing officer that such "shifting" is beyond the intent and reach of section 310.141. The only testimony before the hearing officer explaining that "shifting" is not covered by the statute, was presented by one of the appellants. His testimony was based on the premise that Tampa Bay is a single port and that once a ship clears the customs house at Tampa it is no longer involved, when moving about the bay, in entering or leaving the port. That premise and testimony was rejected by the hearing officer, and properly so in my view. Since the hearing officer correctly found that there are several ports on Tampa Bay, the record does not require this court to find as a matter of law that the act of moving vessels around Tampa Bay from one anchorage to another, or to one of the ports on the bay, does not constitute entering or leaving a state port within the meaning of section 310.141. It is elemental that we cannot substitute our judgment of the facts for that of the hearing officer. § 120.68(10), Fla. Stat. (1985).

III.
Since section 310.001 states that chapter 310 is intended to regulate piloting of vessels in "the waters, harbors, and ports of the state" to the "fullest extent possible," I find no legal or factual basis for concluding that rule 21SS-8.10 exceeds the statutory jurisdiction granted to the Board of Pilot Commissioners. The rule is limited to "any vessel requiring a state pilot," and requires only that such vessels "shall have a state pilot aboard except when in the docking or undocking mode." The rule then defines "docking" and "undocking mode" in language which does not exclude the "shifting" activities described in this case. The legal import of the rule is to clarify the reach of the statute and make clear that any vessel required to have a state pilot in pilotage waters of this state (as defined in section 310.002(5), Florida Statutes (1983)), shall have such pilot on board during the course of moving the vessel incident to entering or leaving ports of this state, except in the docking and undocking mode. This is the "simplistic" construction of the rule argued to us by the Board and accepted by the hearing officer, and it is within the statutory authority of the Board. There is nothing unreasonable about this construction, and we must approve a reasonably permissible construction of the rule which sustains its validity, rather than adopt a construction that renders it invalid.

IV.
The majority opinion relies on State ex rel. Finlayson v. Amos, 76 Fla. 26, 79 So. 433 (1918), as requiring reversal because the challenged rule contains language similar to that deleted by the legislature when enacting the organic statute. I believe reversal is neither mandated nor even supported by the holding in that decision. In Amos it was perfectly clear from the recited legislative history that the amendment in question did not merely strike certain language from the bill; rather, the amendment deleted the words "automobiles of not more than 25 h.p. $7.00" and inserted in lieu thereof the words "For any automobile and other motor-driven vehicle with a seating capacity of one and not more than five persons $5.00." The substitution of specific language for that deleted from *1253 the bill was a clear expression of legislative intent that vehicles having a seating capacity of not more than five persons should pay only $5.00, irrespective of horsepower, and the Supreme Court properly held that the Comptroller could not give it a contrary construction.
The holding in Amos is a far cry from the question presented in this case, and I believe the majority has misapplied it. Amos did not hold that merely deleting language from a statute (without substituting new language), when the record fails to show the precise reason for the deletion, means that the use of similar words in an implementing rule is conclusively forbidden as a matter of law. Yet that is essentially what the majority opinion has cited Amos for in this case. Nor does Amos require this court to accept a construction of a rule that invalidates it when the agency contends for a different construction that is valid under the enabling statute.
In contrast to the situation in Amos, in the instant case the explicit purpose of section 310.141 is to regulate pilotage in the waters of Florida "to the full extent of any congressional grant of authority, except as limited in this chapter." § 310.001, Fla. Stat. (1985).[1] Since rule 21SS-8.10, as construed by the Board, is limited in application to "vessels requiring a state pilot" under the applicable federal and state statutes, no obvious conflict exists between the intent of the statute and the intent ofthe rule, as was the case with the Comptroller's construction of the licensing statute in Amos. Moreover, the instant case contains no competent evidence of statutory history explaining why the phrase "when operating in pilot waters of this state" was deleted from House Bill 1358. Certainly the record does not refute the hearing officer's finding that the subject phrase was probably deleted as surplusage because "pilotage waters" was already statutorily defined to mean "the navigable waters within the boundaries of the state" in section 310.002(5), Florida Statutes. But, most importantly, the Board has in no sense attempted to construe either the rule or section 310.141 as requiring a licensed pilot on board any vessel moving on navigable or pilotage waters of the state irrespective of whether the movement is upon the state's bays, harbors, and rivers incident to entering or leaving ports of the state.

V.
The challenged rule is applicable throughout the state of Florida, not just Tampa Bay. Although the appellants' argument might be properly characterized as an attack on the rule's validity as applied to "shifting" activity in Tampa Bay, the rule has been held facially invalid by this court. The impact of this decision on other ports of Florida, although not considered in the majority decision, may well be of substantial importance to the safety of operations in such ports. For example, the port of Jacksonville is not defined as including the length of the St. John's River from the jetties in the Atlantic Ocean off Mayport to the docks downtown, yet it seems doubtful, under the reasoning of the majority opinion, that the Board could require state-licensed pilots aboard foreign vessels moving up the St. John's River from the jetties to an anchorage point to await entry to the docks in downtown Jacksonville. Permitting the movement of large foreign flagships up that river without requiring any licensed pilot on board would be ridiculous, and certainly not within the contemplation of any intelligent member of the legislature. Surely we must not ascribe to the legislature any collective intent to deprive the Board of power to ensure that state *1254 licensed pilots must be used in these circumstances.
In summary, the rule should be construed as applying only to vessels lawfully regulated by chapter 310 upon the navigable waters of this state incident to entering or leaving the ports of this state. I decline to hold that the rule is an invalid exercise of delegated legislative authority and would hold that the appealed order should be affirmed.
NOTES
[1] Section 310.001 states:

PURPOSE.  The Legislature recognizes that the waters, harbors, and ports of the state are important resources, and it is deemed necessary in the interest of public health, safety, and welfare to provide laws regulating the piloting of vessels utilizing the navigable waters of the state in order that such resources, the environment, life, and property may be protected to the fullest extent possible. To that end it is the legislative intent to regulate pilots, piloting, and pilotage to the full extent of any congressional grant of authority, except as limited in this chapter.