568 So.2d 1283 (1990)
David E. RABREN, Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, Board of Pilot Commissioners, Appellees.
DEPARTMENT OF PROFESSIONAL REGULATION, Cross-Appellant,
v.
BOARD OF PILOT COMMISSIONERS, David E. Rabren, Cross-Appellees.
No. 88-1483.
District Court of Appeal of Florida, First District.
October 2, 1990.
*1284 James J. Evangelista of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, for appellant/cross appellee.
H. Reynolds Sampson, Deputy Gen. Counsel, Dept. of Professional Regulation, Tallahassee, for appellee/cross-appellant Dept. of Professional Regulation.
Patricia Russo, Asst. Atty. Gen., Tallahassee, for appellee Bd. of Pilot Com'rs.
MINER, Judge.
In this appeal and cross-appeal, we are asked to review a final order of the Board of Pilot Commissioners of the Florida Department of Professional Regulation (BPC) which dismissed charges against appellant Rabren's pilot license but found that various docking facilities would be deemed "ports" so as to require state-licensed pilots. For reasons that follow, we vacate that portion of the order which names additional ports, but otherwise affirm the BPC's order.
This case presents the most recent episode in an ongoing dispute between appellant and the BPC which dates back to 1984. Because some of his arguments are based on or make reference to earlier chapters in this controversy, we deem it appropriate to *1285 first outline the statutory framework that has been in place at all times relevant to the instant case. Thereafter, we will review such of the historical facts bearing on the parties' disagreement as are necessary to place the issues on appeal in some understandable perspective.

STATUTORY BACKGROUND
The statutes and administrative rules pertinent to the instant case are as follows:
Section 310.141, Florida Statutes (1987), requires the use of state pilots on certain vessels. The statute reads, in applicable part:
All vessels, except vessels exempted by the laws of the United States or vessels drawing less than 7 feet of water, shall have a licensed state pilot on board when entering or leaving ports of this state.

(Emphasis added).
Section 310.002(4), Florida Statutes (1987), defines the term "port" as follows:
The word "port" means any place in the state into which vessels enter or depart and includes, without limitation, Fernandina, Nassau Inlet, Jacksonville, St. Augustine, Canaveral, Ft. Pierce, West Palm Beach, Port Everglades, Miami, Key West, Boca Grande, Charlotte Harbor, Punta Gorda, Tampa, Port Tampa, Port Manatee, St. Petersburg, Clearwater, Apalachicola, Carrabelle, Panama City, Port St. Joe, and Pensacola.
(Emphasis added).
Section 310.101(1), Florida Statutes (1987), makes certain actions of state-licensed pilots cause for disciplinary action by the BPC. One such prohibited act is
(j) Delegating professional responsibilities to a person when the pilot delegating such responsibilities knows or has reason to know that such person is not qualified by training, experience, or license to perform them.
(Emphasis added). Thus, a state-licensed pilot would be in violation of section 310.101(1)(j) if he were to direct a pilot who held only a federal license to pilot a ship in a situation where section 310.141 required a state license. For violations such as this, the BPC is authorized to issue a reprimand or fine as well as suspend or revoke the license of the state pilot. § 310.101(2), Fla. Stat. The provisions of section 310.101 are substantially repeated in Florida Administrative Code Rule 21SS-8.007.
Finally, section 310.185(1), Florida Statutes (1987), confers upon the BPC "the power to adopt rules necessary to the provisions of this act, in conformance with the provisions of chapter 120."

PAST DISPUTE
In 1984, the BPC promulgated Florida Administrative Code Rule 21SS-8.10, to deal with the practice of "shifting." "Shifting" involves moving a ship from one docking facility to another, presumably within the same port; since the vessel does not leave the port, a state-licensed pilot is not required. To change this situation, Rule 21SS-8.10 provided that a vessel which would require a state pilot must have a state pilot aboard when "underway on the navigable waters of the State." In this manner, the state pilot requirement was divorced from the definition of "port." Thus, under Rule 21SS-8.10, a vessel drawing at least 7 feet of water and not exempted by federal law had to have a state licensed pilot regardless of its entering or leaving port under section 310.141, Florida Statutes.
Rabren challenged the validity of the shifting rule on behalf of the Tampa Tri-County Pilots Association (TRICO), of which he was president. Rabren v. Board of Pilot Commissioners, 497 So.2d 1245 (Fla. 1st DCA 1986), rev. denied, 508 So.2d 13 (Fla. 1987). Although Rabren held and continues to hold both state and federal licenses, TRICO is almost exclusively composed of federal pilots. Because of the shifting rule, Rabren would be subject to discipline under section 310.101(1)(j) and Rule 21SS-8.007 whenever he assigned one of his federally licensed TRICO pilots to shift a vessel. This court found that Rule 21SS-8.10 was an invalid exercise of delegated legislative authority. The majority found that when section 310.141 was originally enacted, the House version contained *1286 a similar provision which would have required state pilots whenever vessels were in navigable state waters. Since the House's version was not adopted, the court viewed the BPC's shifting rule as an expansion of section 310.141 which ran contrary to legislative intent. However, the court noted:
Section 310.141, Florida Statutes, requires state-licensed pilots on foreign vessels entering or leaving the ports of the state. Since Tampa Bay consists of at least four ports, section 310.141 may already apply to shifting activities in Tampa Bay.
Rabren, supra, at 1249.

THE PRESENT CONTROVERSY
On July 20, 1987, The Department of Professional Regulation (DPR) filed an administrative complaint against appellant alleging four violations of Rule 21SS-8.007(1)(j) and sections 310.101(1)(j) and 310.141. Appellant was accused of assigning or permitting federally licensed TRICO pilots to pilot three ships on which the law required state pilots. The complaint alleged that on two occasions in February 1986, appellant assigned Gary Murphy, a TRICO federal pilot, to shift the foreign vessel OCEAN LORD. On another occasion, in September 1986, appellant allegedly assigned Murphy to shift the foreign vessel VOMAR. The "ports" involved in these shifts were Rockport, Big Bend, and Southport (later, Gadsden Anchorage was added, and the Southport designation was more specifically identified as C.F. Industries or CFI). Another count in the complaint alleged that appellant assigned Murphy to pilot the U.S. vessel ASPEN from the sea to a berth in the Port of Tampa; since the ASPEN was entering port from Korea, a state pilot was required. The charge involving the ASPEN was resolved, and is not relevant to the shifting issue presently before the court.
Appellant requested a formal hearing under section 120.57(1), Florida Statutes. The hearing was held on January 8, 1988, and a recommended order was issued on February 1.[1] In appellant's proposed findings of fact he admitted the shifts essentially as alleged in the complaint. Thus, the following shifts were admitted:

2/18/86 OCEAN LORD From CFI to Gadsden Anchorage
2/21/86 OCEAN LORD From Gadsden Anchorage
 to
 Rockport
9/23/86 VOMAR From Rockport to Big Bend

In his findings of fact, the hearing officer found that these shifts did in fact take place. Appellant presented two defenses to the charges: (1) it was not appellant but his wife, TRICO's business manager, who made the assignments, and (2) CFI, Gadsden Anchorage, Rockport and Big Bend are not "ports" within the definition of section 310.002(4) so as to require a state pilot under section 310.141.
According to the hearing officer, the evidence did not support a finding that appellant, rather than TRICO's business manager, assigned the federal pilot. More relevant to the instant appeal, however, are the hearing officer's findings concerning the definition of "port." The hearing officer included the following in his findings of fact:
14. Section 310.002(4), Florida Statutes, defines "port" to mean, any place in the state in which vessels enter and depart. For Tampa Bay, this section lists Tampa, Port Tampa, Port Manatee, St. Petersburg and Clearwater as ports. Of those listed ports, Tampa and Port Tampa are in Hillsborough County and come under the jurisdiction of the Tampa Port Authority.
15. No evidence was submitted showing the areas encompassed by the Port of Tampa and Port Tampa. The Port of Tampa's Terminal and Facilities Map (Exhibit 5) showing the port facilities at Tampa, Florida, does not show the facilities at Port Tampa; it shows only those facilities on the east side of the Tampa peninsula, and does not reach as far south as Big Bend. Presumably, if there are only two ports in Hillsborough County that portion of Hillsborough County west of the Tampa peninsula would comprise *1287 Port Tampa, and that portion of Hillsborough County east and south of the Tampa peninsula would comprise the Port of Tampa. If so, all of the movements here complained of occurred in the Port of Tampa. Exhibit 5 supports this conclusion.
Accordingly, in his conclusions of law, the hearing officer stated:
Gadsden Anchorage, C.F. Industries, Rockport and Big Bend are all located in the port of Tampa. Accordingly, vessels moving between these locations are not entering and leaving port, and under the specific provisions of Section 310.141 do not require the presence of a licensed state pilot, or a deputy pilot, on board during these maneuvers.
... .
In enacting Chapter 310 the Legislature has used the word port in difference [sic] contexts. The definition section, [310.002(4) above quoted, lists five ports in Tampa Bay. Section 310.021(2) uses port as a geographical area in providing that one member of the State Board of Pilot Commissioners shall be selected from the ports of Tampa Bay, Boca Grande, Punta Gorda, Charlotte Harbor or Key West.
The so-called "shifting" rule (proposed rule 21SS-8.10, Florida Administrative Code), which was invalidated in Rabren v. Board of Pilot Commissioners, 497 So.2d 1245 (Fla. 1st DCA 1986), would have required a state licensed pilot on the vessels OCEAN LORD and VOMAR during the movements challenged in these proceedings. The holding in Rabren is that 310.141 requires a state licensed pilot aboard foreign flag vessels when entering or leaving a port. Tampa Bay consists of four ports if St. Petersburg and Clearwater is considered to be one port. Moving a foreign flag vessel between any of these ports requires the presence on board of a licensed state pilot or a certified deputy pilot. This is implicit in Rabren, supra, at p. 1249 that:
Since Tampa Bay consists of at least four ports, section 310.141 may already apply to shifting activities in Tampa Bay.
The hearing officer recommended dismissal of the charges. DPR filed exceptions, and a hearing was held on March 2, 1988. Because the BPC did not have a transcript of the DOAH proceedings, BPC's counsel warned the Commissioners against changing the findings of fact. Counsel also stated that the recommendation of dismissal could not be changed because the Commissioners did not have the transcript and therefore could not review the complete record.
Counsel for DPR argued that the Department's position did not require that the BPC alter the findings of fact. Counsel stated:
[W]e all agreed that Gadsden Anchorage, Cut "A," Cut "B," Cut "C," CFI, all of those are within the geographical limits of the Port of Tampa, but that was not our point. That's [appellant's] point. I think that's probably true. We weren't saying that they ever departed from the Port of Tampa. Our position was when they departed from a place where ships enter and depart, they violated the statute. So again, I don't know that that is a factual dispute.
Shortly before the BPC issued its final order, another hearing was held to determine whether probable cause existed to proceed with additional charges against appellant for similar shifting violations. The BPC found that probable cause existed.
On May 11, 1988, the BPC issued a final order which adopted the recommendation and findings of fact contained in the recommended order. The significant change in the conclusions of law stated:
In addition to the above Conclusions adopted from those of the Hearing Officer, the Board concludes that Gadsden Anchorage, C.F. Industries, Rockport and Big Bend are ports within the meaning of Section 310.002(4), Florida Statutes.
Appellant timely filed the instant appeal as well as a petition for writ of certiorari. The petition was denied, and the court ordered appellant to show cause why the *1288 appeal should not be dismissed since the appealed order was in appellant's favor. After responses from both parties, the court discharged its order and directed the parties to raise the standing issue in their briefs. Such was done.
With respect to standing, appellant argues that the BPC's new rule will have a dramatic effect upon him. Appellant points out that a probable cause panel has already decided to bring charges against him for violating the new rule; his state pilot's license could be suspended or revoked. Moreover, although the instant charges were dismissed, the Administrative Procedure Act (APA) allows prospective challenges to agency rulemaking; an affected party need not violate the rule at his peril in order to obtain standing. For this proposition appellant cites Professional Firefighters of Florida, Inc. v. Department of Health and Rehabilitative Services, 396 So.2d 1194, 1195 (Fla. 1st DCA 1981).
BPC does not respond to appellant's argument on standing, which leads us to conclude that since DPR has filed a cross-appeal, standing is no longer an issue. If it is, however, we first observe that it would be unfair to subject Rabren to the possibility of having the recommended dismissal overturned without hearing his arguments. However, notions of fairness aside, we otherwise find that Rabren has standing to appeal the BPC's final order even though charges against him were dismissed.
In order to obtain judicial review, section 120.68(1), Florida Statutes (1987), requires a person to show: (1) the action is final; (2) the agency is subject to the provisions of the APA; (3) he was a party to the action which he seeks to appeal, and (4) he was adversely affected by the decision. Daniels v. Florida Parole & Probation Commission, 401 So.2d 1351, 1353 (Fla. 1st DCA 1981). In the instant case, the first and fourth items are of particular concern. In short, appellant must show that he has been adversely affected by final agency action.
Although there is no question that the order presently before the court is a final order constituting final agency action, it is less clear whether the conclusion of law to which appellant takes issue can itself constitute "agency action." If action is defined as the outcome or the decision whether or not to impose a sanction, then appellant does not seem to be adversely affected because no sanction was imposed. If, however, action is defined more broadly so as to include a conclusion of law, then appellant can proceed to show that the conclusion of law produces an adverse effect. Because the definition of "agency action" in section 120.52(2), Florida Statutes (1987), includes "the whole or part of a rule or order," and a conclusion of law is part of an order, it would appear that it is appealable without regard to the recommended disposition (i.e., dismissal of the charges).
This raises the question whether appellant is "adversely affected." Appellant argues that the agency's statement contained in the conclusions of law will be used against him as precedent in a later adjudicatory proceeding or as evidence of incipient policy. In terms of standing, we acknowledge that this is close to the boundary which separates injury in fact from mere illusory speculation. See Florida Department of Offender Rehabilitation v. Jerry, 353 So.2d 1230 (Fla. 1st DCA), cert. denied, 359 So.2d 1215 (Fla. 1978). However, the fact that there are pending charges against appellant based upon the legal conclusion contained in the final order serves to distinguish this case from Jerry. While standing here is not overwhelmingly clear, we hold that appellant has standing.
Appellant next argues that in concluding that Gadsden Anchorage, C.F. Industries, Rockport and Big Bend are "ports" within the meaning of section 310.002(4), the BPC adopted a nonrule policy without legislative authority and for which there is no evidentiary basis. He maintains that the BPC exceeded its authority by resorting to the adjudicatory process rather than its rulemaking power. While he acknowledges that the statute expressly conveys rulemaking power to the BPC, he finds no mention made of adjudicatory power and presumably concludes that the *1289 BPC is without such power. We find this argument to be without merit. It is well established that the existence of adjudicatory power can be implied in the statute. 1 Fla.Jur.2d, Administrative Law, § 60. Since the BPC has the authority to take disciplinary actions as well as enter orders, it would appear and we hold that adjudicatory power is present. See § 310.101(1) and (2), Fla. Stat. (1987).
Appellant also argues that the substance of the "rule" is outside the BPC's authority because it contradicts the statute. For this proposition, he cites Rabren v. Board of Pilot Commissioners, supra. Rabren, however, did not involve the definitional provision that is the subject of BPC's latest action. Rather, it involved a rule which altered section 310.141 in a way that the legislature specifically rejected when the statute was enacted. The clear evidence of legislative intent that was present in Rabren is not present in the instant case. Although the definitional expansion that appellant now challenges would have a similar effect upon a limited area within Tampa Bay, the expansion appears to be permitted by the "without limitation" language in section 310.002(4). Moreover, the rule that was the subject of Rabren required state-licensed pilots throughout navigable state waters; the instant action is not so far-reaching.
We agree with appellant, however, that that portion of the BPC's final order designating additional ports is not grounded on a sufficient evidentiary basis. By now it is well established that the choice between rulemaking and adjudication is largely left to the agency. See, e.g., Florida Cities Water Co. v. Florida Public Service Commission, 384 So.2d 1280 (Fla. 1980); McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977). When the agency opts for nonrule or adjudicative policymaking, however, the agency's final order and the record must contain a predicate to support the policy. Florida Power Corporation v. State Siting Board, 513 So.2d 1341, 1343 (Fla. 1st DCA 1987); Florida Cities Water Co., supra; Anheuser-Busch, Inc. v. Department of Business Regulation, 393 So.2d 1177 (Fla. 1st DCA 1981); McDonald, supra, at 583-84. In the instant case, there is no record foundation for the BPC's conclusion that CFI, Gadsden Anchorage, Rockport and Big Bend are ports. The transcript of the DOAH proceeding was not available, and the factual findings adopted in the BPC's final order tend to support a contrary conclusion. Neither does the order offer an explanation or justification for the policy. The BPC simply states in conclusory fashion that the facilities are ports. We find this conclusion to be unsupported by the record.
On cross-appeal, DPR urges that the BPC erred in dismissing the charges against Rabren simply because there was no transcript available. Initially, DPR argues that section 120.57(1)(b)(10), Florida Statutes (1987),[2] which prohibits an agency from deviating from the recommended penalty without reviewing the "complete record," was inapplicable because no penalty was recommended or imposed. We disagree, and hold that the procedural provision was applicable in the instant case. We also note that the provision was applied under similar circumstances in Martin v. Department of Professional Regulation, 485 So.2d 39 (Fla. 2d DCA 1986).
Another argument posed by DPR is based upon the definition of "complete record." According to DPR, section 120.57(1)(b)(6), Florida Statutes (1987), which defines the term, is phrased as a limitation on what may be included in the record and does not require that all the listed items be included. Thus, the complete record may consist of whatever items are provided by the parties. By this reasoning, the BPC was only required to review those items that were presented to it.
*1290 We are not persuaded by this argument. DPR correctly points out that section 120.57(1)(b)(6) limits what can be included in the record. The reason for this limitation is evident in section 120.57(1)(b)(8), where it is stated that findings of fact must be based exclusively on record evidence; the record must be limited to certain items to preserve the integrity of the fact-finding process in formal proceedings. It is unclear, however, how section 120.57(1)(b)(6) relieves the agency of its obligation to review the complete record under section 120.57(1)(b)(10). DPR's argument amounts to saying that the complete record is whatever happens to be provided to the reviewing agency. Thus, DPR effectively negates the review requirement by failing to furnish a transcript to the BPC. As Rabren points out, DPR was the appealing party and it was DPR's responsibility to furnish a transcript. Booker Creek Preservation, Inc. v. Department of Environmental Regulation, 415 So.2d 750 (Fla. 1st DCA 1982). Its failure to carry out this responsibility should not be the basis for subjecting Rabren to a penalty where none had been recommended.
DPR's final argument in support of its cross-appeal is that the unavailability of a transcript is essentially harmless because there was no dispute concerning the facts. We find this argument to be flawed. Although there may have been no dispute concerning the alleged shifts, there may well have been conflict as to the status of CFI, Gadsden Anchorage, Rockport and Big Bend. The hearing officer's findings of fact contain detailed information as to: (1) these facilities' relationship with the Tampa Port Authority; (2) the private or public ownership of the facilities; (3) the nature of the fees imposed for use of the facilities, and (4) the geographical position of the facilities within the port of Tampa. These findings represent the factual foundation for the hearing officer's conclusion that the facilities were within the port of Tampa and did not represent separate "ports." Without a transcript, the BPC had no opportunity to assess these findings. In essence, DPR is urging this court to adopt the same view of these proceedings that the BPC adopted; thus, we are urged to ignore the facts because this is a purely legal question. If, however, this were purely a legal question, then it should not have been resolved in an adjudicatory milieu; such a setting is reserved for the arduous process of developing incipient policy through its repeated application to diverse factual situations. If the BPC wishes to avoid rulemaking and opt for policy development through adjudication, then it must accept the procedural safeguards that apply in formal hearings, among which is the requirement that the record be reviewed prior to changing the recommended penalty. Accordingly we find that the BPC was correct in dismissing the charges against Rabren.
To sum up, we vacate that portion of the final order appealed from naming additional ports. We do so not because we find that the naming of such ports was without the BPC's legislative authority but rather because such designation finds no evidentiary support in the record. With regard to the cross-appeal, the BPC was correct in refusing to change the recommended disposition and that determination is herewith affirmed.
NIMMONS and BARFIELD, JJ., concur.
NOTES
[1] The record does not contain a transcript of the hearing.
[2] Section 120.57(1)(b)(10) provides in pertinent part as follows:

The agency may accept the recommended penalty in a recommended order, but may not reduce or increase it without a review of the complete record and without stating with particularity its reasons therefor in the order, by citing to the record in justifying the action.