393 So.2d 1177 (1981)
ANHEUSER-BUSCH, INC., Appellant.
v.
DEPARTMENT OF BUSINESS REGULATION, Division of Alcoholic Beverages and Tobacco, Appellee.
No. SS-38.
District Court of Appeal of Florida, First District.
February 11, 1981.
*1178 T. Paine Kelly, Jr., MacFarlane, Ferguson, Allison & Kelly, Tampa, for appellant.
Harold F.X. Purnell and Dennis E. LaRosa, Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Judge.
Anheuser-Busch appeals from an order of the Division of Alcoholic Beverages and Tobacco *1179 finding that the brewer's promotional "bar spending" for vacationing collegians at Daytona Beach violated Section 561.42(1), Florida Statutes (1979), the "Tied House Evil" law. The Division assessed a monetary penalty equal to appellant's payments for beer and its tips for service. We reverse the order because of its substantial deficiencies as a policymaking instrument under Chapter 120, Florida Statutes (1979).
Anheuser-Busch, licensed in Florida as a beer manufacturer, sells its products to distributors who in turn sell to retail vendors. To promote its products, the manufacturer sponsored free beer parties in 16 Daytona Beach bars and taverns during the college Spring break in 1978. Anheuser-Busch paid the vendors their usual retail price for Anheuser-Busch beer consumed by the vendors' customers during those parties and paid conventional tips to the vendors' employees who served that beer. Appropriately enough, this is called manufacturer's "bar spending." For beer and service Anheuser-Busch paid approximately $7,000 to selected Daytona Beach vendors and their employees during a four-day period in March 1978.
The Division charged that the manufacturer's bar spending constituted "the giving of a gift, loan of money or property or ... the giving of a rebate" to retail vendors, in violation of Section 561.42(1), which provides:
(1) No licensed manufacturer or distributor of any of the beverages herein referred to shall have any financial interest, directly or indirectly, in the establishment or business of any vendor licensed under the Beverage Law, nor shall such licensed manufacturer or distributor assist any vendor by any gifts or loans of money or property of any description or by the giving of any rebates of any kind whatsoever... .
Exercising its power to "establish rules ... to enforce the herein established limitation upon credits and other forms of assistance," Section 561.42(8), the Division has promulgated Rules 7A-1.09 and 7A-1.10, Fla. Admin. Code, amplifying the terms "rebate" and "gift" as used in the statute:
7A-1.09 Rebate. The term "rebate" (often referred to as accumulative promotion or retroactive discount) shall include any refund or discount made or allowed other than such discounts as are permitted under Section 561.42, Florida Statutes [allowing trade discounts in the usual course of business, Section 561.42(6)]; and as such they are prohibited.
7A-1.10 Gift. The term "gift" shall apply to the giving of free goods or things of value as a discount not otherwise permitted by law or reward for purchasing any given quantity of alcoholic beverages either at one time or over a period of time; and as such they are prohibited.
The Division and Anheuser-Busch presented the present licensee discipline complaint to a hearing officer of the Division of Administrative Hearings on a barebones stipulation of facts, substantially as recited above, which concluded:
Bar spending (i.e., the practice of a representative of a manufacturer or of a wholesaler of purchasing drinks for consumers at the premises of a retail licensee) has long been an industry marketing practice in Florida, albeit on a more limited scale than set forth above. The Florida Division of Alcoholic Beverages and Tobacco has known of the practice, but has never before brought any action against a licensee for such bar spending activities, or otherwise advised the brewing industry of its opposition to spending on any scale. The brewing industry has never sought such an opinion as to the legality of bar spending from the Division. This is the first activity known to the Division incorporating all of the features described in the foregoing statement.
The Division argued to the hearing officer that bar spending "incorporating all of the features" of this particular promotional campaign constituted a "rebate" or "gift" by the sponsoring manufacturer to the retail vendors in that the retailers received increased gross revenues as a result of the parties, or they received increased profits *1180 due to discounts allowed by distributors for their greater than ordinary purchases for the parties. The hearing officer rejected these propositions as a matter of fact because the Division's abbreviated proof did not show that the vendors sold more beer at Anheuser-Busch's expense than they would have sold at their customers' own expense. The hearing officer concluded:
Having failed to establish the increased volume theory, the [Division] is unable to demonstrate increased profits due to increased volume, ergo there is no "rebate" or retroactive discount that has been shown by the [Division] in its proof. Moreover, the ordinary meaning of the word "rebate" does not lend itself to the establishment of a "rebate" by the evidential facts adduced in this hearing... .
... [T]here is no showing that [Anheuser-Busch] was repaying, making restoration or returning money to the vendors as a form of restitution or repayment when it purchased the alcoholic beverages for the benefit of the patrons of the vendor... . There is no showing that the vendors paid any less than usual when they purchased the products which were subsequently given away to the general public and paid for by [Anheuser-Busch] at the usual prices.
The [Division] has also failed to prove that the "bar spending" constituted a "gift" within the meaning of Rule 7A-1.10, Florida Administrative Code. The free goods that were given were goods given to the general public and, absent a showing that the volume of sales would have been increased due to [Anheuser-Busch's] purchase of the alcoholic beverages, it cannot be shown that the vendors were extended free goods... . Finally, the [Division's] assertion that the mere act of having the promotional staff of [Anheuser-Busch] put on the bar party constituted a "gift" or reward is not convincing for reason that the proof does not indicate that particular benefit.
The hearing officer recommended an order finding that the charges had not been sustained.
The Division's final order, while purporting to accept the hearing officer's findings of fact, drew the different conclusion that "the entire party from beginning to end was a gift to the vendor" which had "substantial intrinsic if not precise worth to the vendor in the party's effect on the vendor's profit, overhead, cash flow, promotional value, competitive edge, advertising and good will." The Department's order concluded:
It is beyond reason to suggest that the vendors did not receive a financial benefit from the transaction outlined in the facts of this case. If the promotional activities of [Anheuser-Busch] in this case are not prohibited, then nothing would prevent manufacturers similarly situated from having 1, 5, 50, or 100 free parties per year at preferred or key vendors locations. Such would be an inducement for other vendors to carry the products of the promoting manufacturer, thus creating a Tied House effect heretofore condemned in this State.
Thus the Division's order in this case equates the antitrust, antifavoritism and antipredator purposes of Section 561.42(1) with the perceived dangers of manufacturers' bar spending. Through this order there begins to emerge a Division policy, rooted in the statute, which condemns manufacturers' bar spending in a certain volume or when carried out with a certain sophistication and forethought ("The instant matter does not involve the situation in which a member of Respondent's promotional staff went in to a vendor's place of business unknown to the vendor and bought a round of the Respondent's products for the patrons. Instead, it involves a promotional scheme ...").
On this record the Division cannot successfully dispute the hearing officer's findings that there was no proof of a manufacturer's "gift" or "rebate" in the sense of discounts realized by vendors in purchasing greater than usual quantities of Anheuser-Busch beer from distributors or in the sense of income or profits realized by serving greater than usual quantities of beer to their patrons. The record is not susceptible *1181 to the Division's substituted finding that the bar spending had "substantial intrinsic if not precise worth to the vendor in the party's effect on the vendor's profit, overhead, [and] cash flow... ." Therefore no violation of Section 561.42(1) can be founded particularly on Rules 7A-1.09 and 7A-1.10, whose terms emphasize the "gift" and "rebate" characteristics of direct financial rewards given by a seller to a buyer in return for purchases in the chain of distribution. The Division's order finding a violation of Section 561.42(1) therefore depends less on the precise terms of Rules 7A-1.09 and 7A-1.10 than on the general purposes of the statute itself, whose reach the Division says is illustrated but not exhausted by the Rules:
The definitions [Rules 7A-1.09 and 7A-1.10] do not indicate that they are exclusive of any other commonly used meaning of the words ["gift" and "rebate"], nor should an agency interpretation of a statute by rule be used to frustrate the clear and unambiguous intent of the law.
The Division correctly suggests that having rules which particularly define one sort of conduct within the reach of a regulatory statute does not foreclose the Division's application of the statute to other conduct through adjudication. If by promulgating a single set of interpretative rules an agency should lose power to further interpret the statute through adjudication, then not only the regulatory statute but APA processes as well would be frustrated. Agencies may expound statutes given in their charge by rules or by orders, or by both rules and orders. The model of responsible agency action under the APA is action faithful to statutory purposes and limitations, foretold to the public as fully as practicable by substantive rules, and refined and adapted to particular situations through orders in individual cases. See McDonald v. Dept. of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977).
Notwithstanding the continued availability of adjudication as a means of Section 561.42(1) policy development within the Division's delegated authority, this plainly is a case of policymaking for which rules are preferable to orders. Florida Cities Water Co. v. Public Serv. Comm'n, 384 So.2d 1280, 1281 (Fla. 1980); City of Plant City v. Mayo, 337 So.2d 966, 974-75 (Fla. 1976); McDonald, supra; General Development Corp. v. Division of State Planning, 353 So.2d 1199, 1209 (Fla.1st DCA 1977). That is so, first, because "established industry-wide policy is being altered" by the imposition of new restraints on a heretofore common but unregulated industry practice, Florida Cities, supra, 384 So.2d at 1281; and second, because rules make policy prospectively after notice, whereas orders extract policy from events viewed retrospectively, and a licensee discipline order under Section 120.60 has the added potential of assessing severe and judicially unreviewable penalties for violation of a statutory norm made explicit only by the disciplinary order. Here, for example, while the Division may be entirely justified in construing the Tied House Evil statute to prohibit certain (or all) manufacturer's bar spending, it surely is too much to claim, as the Division's order seemingly does, that the statute's prohibition of bar spending is "clear and unambiguous," i.e., readily ascertainable by a licensee: reasonably susceptible to that construction, yes; clear and unambiguous, no.
This, then, is not a case in which licensee discipline is sought for violation of an explicit statute or rule, or for an act tainted by standards which are commonly understood though only generally expressed by statute. This is rather a case in which licensee discipline is imposed for violation of rather general, morally neutral, and somewhat technical statutory standards which the order makes explicit only retrospectively and only in terms of the discrete facts at hand. Federal administrative agencies are thus permitted to "proceed retroactively by adjudication to find past conduct illegal, even though such conduct has not been identified as illegal by an agency rule." SEC v. Chenery, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), characterized by Mayton, The Legislative Resolution of the Rulemaking *1182 Versus Adjudication Problem in Agency Rulemaking, 1980 Duke L.J. 103, 116. In Florida, too, the choice between rulemaking and adjudication is left largely to the agency. Florida Cities, supra, 384 So.2d at 1281. But when substantial private interests are to be determined entirely by retrospective policymaking through adjudication, and the conduct in question is such that the licensee likely would have conformed to any agency standard of which it had notice rather than incur the financial and other burdens of disciplinary action, Florida regulatory agencies may reasonably expect a reviewing court to ponder carefully whether agency rulemaking was reasonably practicable as well as desirable and, if so, whether the agency's order meets all APA standards for policymaking orders issued in lieu of rules, and whether any error impaired "the fairness of the proceedings or the correctness of the action." Section 120.68(8), Florida Statutes (1979).
In other words, a reviewing court may be expected to defer to the executive's Chapter 120 privilege, wide in scope but not unlimited, to say when its emerging policy within statutory bounds has settled sufficiently for rulemaking. But though we will ordinarily "withhold judicial imperatives" for rulemaking, in deference to a coordinate branch of government, we are bound to give full effect to the APA's "self-enforcing" incentives for rulemaking  those requirements concerning orders by which "agencies will be pressed toward rulemaking by the necessity otherwise to explicate and defend policy repeatedly in Section 120.57 proceedings... ." Hill v. School Board of Leon County, 351 So.2d 732, 733 (Fla. 1st DCA 1977).
From an agency's point of view, the case-by-case emergence of incipient policy through adjudication has certain understandably attractive features in comparison to rulemaking. Chief among those seeming advantages are retroactivity, particularity, and flexibility. To make a substantive rule an agency must think comprehensively, risk rebuff by the legislature's administrative procedures committee, Section 120.545, and be willing to live with a basic policy choice, making refinements by adjudication, until that choice is changed by more rulemaking. But policymaking by adjudication has certain costs as well. Foremost among those costs to the agency is that the accuracy of every factual premise and the rationality of every policy choice which is identifiable and reasonably debatable must be shown by some kind of evidence undergirding the order which makes that policy choice on that factual premise.
In other words  by way of example drawn from the circumstances of this case  if by reason of the generality of the statute certain conduct is not predictably objectionable, but it may be proscribed or not depending on how the agency views the effect of that conduct and the objects of the statute, then, to the extent the agency's reasoning can be isolated, identified, and demonstrated by evidence appropriate to the occasion, the agency must create a record foundation for its order that the conduct objected to has effects which the statute is construed to condemn. It is insufficient for an agency to prove only the empirical events which are the chosen vehicle for policymaking  that, say, Anheuser-Busch bought a lot of its beer from various Daytona Beach taverns in the Spring of 1978  and then to expound elegantly, but without a record foundation, that those purchases were forbidden by Section 561.42(1).
We find, therefore, that there is no evidentiary basis in the stipulation or elsewhere in the record for the Division's factual premise that the bar spending complained of gave "promotional value, competitive edge, advertising and good will" to the host bars and taverns. The hearing officer rightly said "the proof does not indicate that particular benefit." And even if that factual premise were shown, the Division's proof does not show further why conferring such a "benefit" through manufacturers' bar spending should be regarded under Section 561.42(1) as equivalent to giving a gift or rebate to, or acquiring a financial interest in, a vendor. We decline to accept these elements in the Division's reasoning as a matter of common knowledge, economic *1183 logic, or abstract statutory interpretation, for both the Division's factual premise and its reasoning from the statute are capable to being demonstrated by expert testimony, documentary opinion, or other evidence "appropriate in form [to the] nature of the issues involved"; and those elements in the Division's reasoning are in need of testing by cross-examination, countervailing testimony or documentary proof, or in other ways appropriate to the form of the evidence. Section 120.58(1)(a); cf. Balino v. Dept. of Health & Rehab. Serv., 362 So.2d 21, 24 (Fla. 1st DCA 1978), cert. den., 370 So.2d 458 (Fla. 1979) (rulemaking proceedings); DeLong, Informal Rulemaking and the Integration of Law and Policy, 65 U.Va. L.Rev. 257, 295 (1979). Lacking a record foundation for the policy it attempts to establish, the order of the Division assessing civil penalties against Anheuser-Busch must be vacated.
Our decision here was foretold by McDonald:
2. Sections 120.52(14) and .54 require that agency policy statements of general applicability be adopted as rules and Section 120.57 requires proof of incipient agency policy not expressed in rules and subjects it to countervailing evidence and argument. (emphasis in original, 346 So.2d at 579.)
.....
To the extent the agency may intend in its final order to rely on or refer to emerging policy not recorded in rules or discoverable precedents, Section 120.53(2), that policy must be established and may be challenged by proof. (346 So.2d at 582.)
See also State Dept. of Administration v. Harvey, 356 So.2d 323, 326 (Fla. 1977):
To the extent Division policy is not incorporated in regularly adopted rules, the Division may be required by any disappointed applicant to defend its policy in a Section 120.57 proceeding where the Division will be required to present evidence and argument and to "expose and elucidate its reasons for discretionary action." McDonald, supra, 346 So.2d at 587.
Recently the Supreme Court endorsed the "record foundation" discipline for nonrule policymaking. Florida Cities, supra, 384 So.2d at 1281:
Nonetheless, when an agency elects to adopt incipient policy in a non-rule proceeding, there must be an adequate support for its decision in the record of the proceeding. McDonald at 583-84. In this case, there is absolutely no record foundation for the commission's disallowance of CIAC and AIAC deductions.
To further illustrate the point: in McDonald we found that certain statutory criteria for the issuance of a bank charter  the bank's "reasonable promise of success" and the skill of its proposed management, Sections 659.03(2)(b), (d)  were "ultimate facts ... infused by policy considerations for which the agency has special responsibility," and so were subject to elaboration and decision by the Department of Banking and Finance notwithstanding contrary findings of the hearing officer. Nevertheless, we pointed out that
The hearing officer's function creates agency incentives for rulemaking, which as far as it goes displaces proof and debate of policy in 120.57 proceedings; [and] encourages an agency to fully and skillfully expound its nonrule policies by conventional proof methods... . (346 So.2d at 583.)
Because the Department of Banking and Finance could show no record predicate for its preferred standards elaborating the subsections (b) and (d) criteria, we held the Department foreclosed from further consideration of those issues, though the case was remanded for discretionary action on issues on which the Department had created a satisfactory record.
The Supreme Court dealt similarly with a silent record in Florida Cities, a water/sewer rate case in which the Public Service Commission reversed its prior "industry-wide policy" and denied the utility the benefit of claiming, as an expense affecting rates, depreciation of the value of construction money or property advanced or contributed to the utility by customers and developers. *1184 Characterizing the Commission's policymaking as more suitable for rulemaking than for adoption "in a non-rule proceeding," the Court did not demand rulemaking but allowed the APA's discipline for policymaking orders to provide incentives for rulemaking: the Court vacated the Commission's order for lack of a "record foundation," that is, for lack of any "evidence presented to support the Commission's change in policy... ." Florida Cities, 384 So.2d at 1281 and (dissenting opinion) 1283. Plainly, the missing "record foundation" was a Commission showing, by some kind of evidence, that as a matter of statutory policy the value of advances and contributions in aid of construction should not be treated as depreciable.
Because the Division's final order in this case undertook to establish and is based upon nonrule policy which we judge was susceptible of verification by evidence in the proceedings before the hearing officer, but which was not proved by the Division, the order finding violations of Section 561.42(1) and assessing civil penalties lacks a record foundation and is therefore VACATED.
BOOTH and SHIVERS, JJ., concur.