## DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES v TALLAHASSEE MEMORIAL REGIONAL MEDICAL CENTER, INC., etc.

### Case No. 85-3247

State of Florida, Division of Administrative Hearings

September 17, 1986

### APPEARANCES OF COUNSEL

**John L. Pearce,** District Legal Counsel, Department of Health and Rehabilitative Services, for petitioner.

**John D. Buchanan, Jr., Henry, Buchanan, Mick & English,** for respondent.

### OPINION

DIANE A. GRUBBS, Hearing Officer.

#### RECOMMENDED ORDER

Pursuant to notice, a hearing was held in this cause on March 27,

1986, in Tallahassee, Florida, before Diane A. Grubbs, a hearing officer with the Division of Administrative Hearings.

## ISSUES

Whether respondent was in violation of Section 43.201(6), *Florida Statutes*, and Rule 10D-41.33(2), *Florida Administrative Code*, by failing to observe certain quality control procedures and by failing to document actions taken as alleged in the Administrative Complaint.

## BACKGROUND

By Administrative Complaint dated July 25, 1985, Petitioner alleged that respondent had violated Section 43.201(6), *Florida Statutes* and Rule 10D-41.33(2), *Florida Administrative Code*. The following specific violations were alleged:

(a) Respondent failed to observe quality control procedures, in that RIA background record did not contain acceptable limits.

(b) Respondent failed to provide documentation to show that the osmometer was calibrated each day of use.

(c) Respondent failed to include controls with each run of toxi lab determination.

(d) Respondent failed to observe quality control procedures, in that three levels of controls were not run on the first shift and a minimum of two (2) levels of controls were not run on each eight hour shift thereafter in the Blood Gas laboratory.

(e) Respondent failed to consistently document corrective action when control results were out of limits in the chemistry lab.

(f) Respondent failed to observe quality control procedures, in that tapes from the Quantum drift test were not retained for two (2) years.

(g) Respondent failed to observe quality control procedures in that the constant packing of the microhematocrit centrifuge, in the hematology lab, was not checked quarterly.

(h) Respondent failed to provide documentation to show that controls were included with factor assay.

(i) Respondent failed to insure that the actual results for the fibrometer timer and stopwatch were recorded.

(j) Respondent failed to insure that corrective action was consistently documented when control results were out of limits.

(k) Respondent failed to observe quality control procedures, in that

the constant packing of the microhematocrit centrifuge, [in] the family practice lab, was not checked quarterly.

On August 21, 1985, Tallahassee Memorial Regional Medical Center (TMRMC) petitioned for a formal administrative hearing alleging that the petitioner's "own rule is vague and misleading and does not set a standard and, therefore, the [respondent] is not in violation of either the statute or the rule. . . ." The Department referred the matter to the Division of Administrative Hearings for further proceedings.

At the hearing, the petitioner presented the testimony of Laura M. Phillips, a Biological Administrator with the HRS Office of Licensure and Certification; and Frances Bass, the HRS surveyor who inspected the TMRMC laboratory. The respondent presented the testimony of James Alan Parker, Laboratory Manager at TMRMC, and Dr. Benjamin M. Turner, a pathologist who is one of the medical directors for the TMRMC laboratory. Petitioner's exhibits 1 through 10 and respondent's exhibits number 1 were admitted into evidence.

Both parties timely filed proposed findings of fact and conclusions of law, and a ruling on each proposed finding of fact has been made in the appendix to this recommended order.

## FINDINGS OF FACT

### GENERAL BACKGROUND

#### STANDARDS APPLIED:

(1) In 1967, the Medicare program was established by the federal government. It provided for reimbursement to independent clinical laboratories for services furnished to Medicare patients. Standards for the clinical laboratories were set forth No. 5 (Code of Federal Regulations, Title 20, Chapter 3, Part 405), entitled Conditions for Coverage of Services of Independent Laboratories (henceforth Subpart M). Subpart M was administered by the Health Care Financing Administration (HCFA). Also, in 1967, the Clinical Laboratories Improvement Act of 1967 (CLIA) was passed by the federal government which applied to laboratories engaged in interstate commerce, and a new Part 74 was added to the Public Health Services Regulations, Title 42, Code of Federal Regulations, which set forth the standards for these laboratories.

(2) In 1967, the Florida legislature completely revised the clinical laboratory law that had been in effect in Florida since 1949 by enacting the Florida Clinical Laboratory Law. Ms. Phillips testified that the purpose of the legislation was to parallel the federal requirements for clinical laboratories so that the same standards would apply to all

laboratories in Florida. Thus, Florida has applied federal standards in its state inspections since 1967.

(3) Rule 10D-41.33, *Florida Administrative Code*,[1]

contains language patterned after the language set forth in Subpart M in 1967.[2]

Thus, although the rule does not incorporate the federal standards by reference, HRS contends that clinical laboratories would be aware that federal standards would apply to state inspections due to the language used in the Rule.[3]

However, clinical laboratories in Florida were never specifically notified that federal standards would apply to state inspections and they were never sent federal regulations, standards or guidelines.

(4) TMRMC has been accredited by the Joint Commission on Accreditation of Hospitals (JCAH) since 1979. In 1978, the JCAH adopted the federal quality control standards. Therefore, JCAH accredited hospitals are not subject to federal inspection because, if they meet JCAH standards, they met federal standards. However, the JCAH inspects only once every three years.

*HRS INSPECTIONS:*

(5) HRS has a contract with the federal government to perform the inspections of clinical laboratories that are required under federal law. HRS also performs the inspections required by state law. HRS applies the same standards regardless of whether it is a state or federal inspection.

(6) Since 1983, state inspections of clinical laboratories have been required annually. However, due to a lack of personnel, annual inspections of every laboratory have not been possible.

When an inspection is done, the HRS surveyor has a checklist form to provide a guidelines for the inspection. The checklist form follows the requirements in the rules and policies put out by the federal government. After the inspection is concluded, the hospital is not provided with a copy of the checklist but is given a list of deficiencies

---

[1] Rule 10D-41.33 was amended after the inspection involved in this case, and all references to Rule 10D-41.33 refer to the rule in effect in April of 1985.

[2] In 1977, the pertinent part of Subpart M was revised to contain the same language as in the CLIA regulations governing quality control, which was more specific.

[3] HRS uses the more specific standards currently in Subpart M even though the language of the rule correlates to the language used in Subpart M prior to its amendment in 1977.

which are taken from the checklist. The inspector also informs the laboratory director of the deficiencies verbally at an exit conference.

(8) The hospital or laboratory gets the statement of deficiencies from HRS on a standard form which lists the deficiencies on the left side and provides space for the laboratory to indicate a plan for correction on the right side. The hospital fills in the right side of the form and returns it to HRS. If the laboratory does not receive a reply back from HRS, the response from the laboratory is acceptable to HRS.

*HRS INSPECTION OF TMRMC:*

(9) The TMRMC laboratory has been inspected three times by HRS: in 1980, in 1982 and in 1985. The inspection involved in this case occurred from April 16th through April 19th of 1985.

(10) The inspection that occurred in 1982 resulted in cited deficiencies. The lab responded to those deficiencies in accordance with HRS procedure. TMRMC did not receive a reply back from HRS on most of the responses and, therefore, considered that those responses provided for adequate quality control.

(11) HRS does not customarily impose a fine for a violation unless it is a repeat violation.

## SPECIFIC CHARGES

*a. RIA BACKGROUND RECORD DID NOT CONTAIN ACCEPTABLE LIMITS:*

(12) The RIA background records are associated with an instrument called a gamma counter. The gamma counter counts radioactivity. To insure accurate readings, the level of background radiation must be determined and must be within acceptable limits. Each day prior to running any tests, TMRMC personnel determined the background level, recorded it, and adjusted the machine to subtract the background level so that it would not affect the test results. However, as the background level gets higher, the possibility for error becomes greater. A background level that is too high might affect the test results. Therefore, an acceptable background limit is established. TMRMC established 35 as an acceptable limit. The limit was recorded in the procedures manual for the machine. Since the background limit was stated in the manual, the laboratory technologists did not write it down each time they recorded the background level. Laboratory personnel were to read the procedures manual prior to doing the test and thus would be aware of the limit. Further, the technologists who ran the tests were highly skilled personnel and, after performing the procedure several times, were aware of the limit since it does not change.

258

(13) The background level recorded was outside the limit nine days in March and about 14 days in April of 1985. However, there was no evidence presented as to how far over limit the levels were. TMRMC has a very stringent background limit. A limit of up to 100 would be acceptable. Therefore, at TMRMC, if the background level is slightly over limit, where the test results would not be affected, the machine might simply be adjusted to the background level. However, if the background level is well over limit, the machine would be cleaned.

(14) In 1982, TMRMC was notified of a deficiency in their records with the statement "RIA background counts records did not contain acceptable limits." (P.Ex. #7, p.3). TMRMC interpreted this as meaning that the background limit had to be recorded in the manual.

(15) The failure to write down the background limit each time the background level is recorded is not inadequate quality control since the background limit is recorded in the procedures manual. Although the labs inspected by Mrs. Bass have always included the background limit on their records, the repetition of the limit each time the level is recorded is simply unnecessary for adequate quality control, and there was no evidence presented that any state, federal, or other authority required that it be done to insure adequate quality control.

*b. FAILURE TO PROVIDE DOCUMENTATION TO SHOW THAT OSMOMETER WAS CAIBRATED EACH DAY OF USE.*

(16) An osmometer measures osmolality, the concentration of particles in a solution. TMRMC calibrated the instrument to three standards each time the instrument was run. The osmometer displays from 0 to 1,000 millivolts. A standard is placed in the instrument, and the instrument is set so that the volt reading correlates to the standard. TMRMC uses 100, 290, and 1,000 standards. Each standard is placed in the machine, the machine is calibrated to that standard,and an electronic curve is created. After all three standards are set, the technician puts a checkmark on the sheet to indicate the procedure has been followed. Each standard has its number on the bottle. Therefore, it is unnecessary to write down that the 100 standard was set at 100, the 290 set at 290, and the 1,000 set at 1,000. The checkmark indicates that all three standards have been properly set. After the standards are set, controls are run to insure that the calibration is correct. Mrs. Bass, who performed that inspection, felt that the three numbers had to be written down each time the machine was calibrated. However, TMRMC uses the same three standards to calibrate the osmometer each time, the written procedure for the machine requires that all three standards be used to calibrate the instrument, and a checkmark

**259**

provides the same quality control as writing down 100, 290 and 1,000. Therefore, the checkmark is sufficient documentation to show that the osmometer was calibrated each day of use.

(17) HRS rules do not require that the standard number be written down each time to provide documentation, nor do the regulations of Medicare, the CLIA, or the College of American Pathologists. The only requirements are that the machine be calibrated and that the performance of the calibration be documented.

*c. FAILURE TO INCLUDE CONTROLS WITH EACH RUN OF TOXI LAB DETERMINATION.*

(18) Toxi-lab is a screening procedure for abusive drugs, such as marijuana and cocaine. A control should be included with each run. TMRMC did include a control with each run, but did not run a control each time in the extraction process.[4]

A control is a sample that contains the analyte which is being checked. It is run through the process at the same time that the specimen is tested. If the control reads the way it is supposed to read at the end of the process, it is presumed that the specimen has been properly processed.

(19) There is nothing in the HRS rules that requires a control to be run with each test. However, the federal regulations specify that a standard and a control are to be run with each clinical chemistry test when such are available. Further, adequate quality control would generally require a control to be run. However, with the newer more automated instruments and procedures, running a control with each test is not necessarily required.

(20) The toxi-lab test is a fairly new test which became commercially available in 1980 or 1981. There are two types of controls that are used with the test. When HRS inspected in 1982, it stated that a control needed to be run in the extraction process. However, there was no control available for the extraction process at that time. Subsequent to that inspection, a control for the extraction process was found. The company that produced the control recommended that it be run at least once a week, and TMRMC followed the manufacturer's recommendation. Running a control through the extraction process could

---

[4] The testing process begins by placing the patient's urine or serum sample in the extraction tube which is then centrifuged to get a layering effect. Certain interfering substances are removed by the extraction tube, and then the technologist removes the layer that has the drugs in it. This portion of the test is the extraction process. Throughout the rest of the test, the developing and detecting steps, a control is run with each patient.

indicate whether a tube was defective or whether the technologist's technique was correct. However, due to the nature of the test, the fact that the technologist's technique on the control is adequate does not indicate that the patient's specimens are handled properly, and the same applies to the incident of defective tubes. In other words, running a control along with the specimens cannot insure that the tubes with the specimens are not defective or that the technologist's technique on the specimens is the same as on the control.[5]

(21) There was no evidence presented to show that the failure to run a control through the extraction process each time resulted in inadequate quality control. In 1982, HRS stated only that TMRMC had to run a control through the extraction process; it did not specify that the control had to run each time. Therefore, TMRMC followed the manufacturer's recommendation for the frequency in which to run a control through the process.

*d. THREE LEVELS OF CONTROLS WERE NOT RUN ON THE FIRST SHIFT AND A MINIMUM OF TWO (2) LEVELS OF CONTROLS WERE NOT RUN ON EACH EIGHT-HOUR SHIFT THEREAFTER IN THE BLOOD GAS LABORATORY:*

(22) On the blood-gas analyzers, there are three basic levels of controls—a low, a medium, and a high—which are used to check the calibration of the instrument. TMRMC did not have any shift in which all three levels were run. Mrs. Bass stated that HRS requires three levels to be run on one shift, and two levels to be run on the other two shifts, in order for a lab to provide adequate quality control. There is a dispute among the authorities on what is necessary to provide adequate quality control. Some authorities suggest that three levels must be run on each of the three shifts; other authorities believe that two, two, and two is sufficient. In 1982, TMRMC was advised that they had to run the tests on a three, two and two basis. However, subsequent to 1982, TMRMC acquired a newer instrument that was more sophisticated. Thereafter, TMRMC ran one level on each shift, except on days when open-heart surgery was scheduled. On these days, two levels were run on the first shift. The new instrument acquired by TMRMC performs self-checks with sufficient frequency to detect problems in the instruments. The earlier instruments were completely manual and had no self-checks built into them. Therefore, a greater number of controls had to be run to provide adequate quality controls on the earlier machines.

---

[5] Probably the best quality control for finding defective extraction tubes is a visual inspection. Each tube has a mark on it to indicate the proper solvent level. If the level is lower than the mark on the tube, the extraction tube should not be used.

Further, the laboratory has two of these highly sophisticated instruments, and whenever a value for a patient deviates from the norm, the specimen is checked on the other machine.

(23) Although TMRMC contends that it was running at least one level on each shift, and two levels on the first shift when there was open heart surgery scheduled, TMRMC failed to provide any documentation that they were consistently running a control on the 11:00 at night to 6:00 on the morning shift. Obviously, despite the degree of sophistication of the instruments used by TMRMC, even TMRMC felt that adequate quality control required that a control level be run in each shift. However, it is impossible to determine whether the control was run each shift because there was no documentation that it was done. Therefore, TMRMC failed to provide adequate quality control by failing to provide documentation that any control was run daily on the third shift.

*e. FAILURE TO CONSISTENTLY DOCUMENT CORRECTIVE ACTION WHEN CONTROL RESULTS WERE OUT OF LIMITS IN THE CHEMISTRY LAB:*

(24) In February, March and April of 1985, control results in the chemical laboratory were out of limits on 21 occasions. During this time, there was no documentation of any action taken to correct this situation. There was no way of knowing what corrective action was taken before patient results were reported. Since there was no documentation as to what corrective action was taken when the laboratory records showed that the results were not within the stated acceptable limits, there was no way of knowing whether corrective action was actually taken. In many cases a control specimen may be out of limits and still be acceptable. Approximately five percent of the control results will be outside the limits that are set. Corrective action is not always indicated merely because the control is outside of the acceptable limits. It must be a judged in the context of the entire day's work to determine whether there is something actually wrong or whether it is just a statistical fluke. Nevertheless, in the 21 instances cited, TMRMC failed to indicate that corrective action was not necessary under the circumstances. Because no documentation was provided, it is impossible to determine whether the out of limits results were acceptable, so that corrective action did not need to be taken, or whether the out of limits results indicated that corrective action needed to be taken and no corrective action was performed. Therefore, by failing to provide the appropriate documentation, TMRMC failed to provide adequate quality control.

262

*f. TAPES FROM THE QUANTUM DRIFT TEST WERE NOT RETAINED FOR TWO (2) YEARS:*

(25) TMRMC was unable to locate the tapes from the Quantum drift test for the previous two years. During her investigation, Mrs. Bass asked the supervisor to produce the tapes containing the results of the Quantum drift test, which is used as part of RIA analysis, but the supervisor was unable to produce the requested documentation. TMRMC stated that the tapes for the Quantum drift test were retained for two years. The majority of them were discovered after the inspection. The tapes had been relocated from one room to another. Nevertheless, at the time of the inspection, TMRMC did not have the tapes and didn't know where they were.

*g. THE CONSTANT PACKING OF THE MICROHEMATOCRIT CENTRIFUGE, IN THE HEMOTOLOGY LAB, WAS NOT CHECKED QUARTERLY:*

(26) To determine optimum packing of the centrifuge, twelves vials are paired, and one pair is run one minute, one pair is run two minutes, one pair is run three minutes, one pair is run four minutes, one pair is run five minutes, and one pair is run six minutes. The time which reveals the optimum packing in both of the tubes would be the amount of time to spin hemotocrits in the centrifuge. TMRMC did not provide any documentation to show that this procedure was run quarterly. In 1982, HRS advised TMRMC that the timer and constant packing of the microhematocrit centrifuge had to be checked quarterly. TMRMC responded saying that it felt that checking the timer monthly on the centrifuge and checking the speed of the centrifuge monthly was a better check than the constant packing quarterly. TMRMC also noted that such testing was in compliance with College of American Pathologists' checklist, and that quarterly packing would not assure better results. HRS failed to reply to TMRMC's response. Therefore, TMRMC assumed that HRS had accepted the alternate quality control provided by TMRMC. In that the evidence established that HRS replied to any response by a laboratory that was not acceptable, it must be concluded that the procedures followed by TMRMC provided adequate quality control.

*h. FAILURE TO PROVIDE DOCUMENTATION TO SHOW THAT CONTROLS WERE INCLUDED WITH FACTORY ASSAY:*

(27) There are different factors pertaining to the clotting of blood. When Mrs. Bass reviewed the records for February and March, she could not find any FDP controls, and for the month of February, she

could find any Thrombin controls. The controls are needed to insure that the reagents are performing as they should, that the methodology is performing as it should, that the technique is acceptable, and that the patient results are as accurate as possible. The records provided documentation that the controls were used in other months but not during the particular months mentioned. The problem with the documentation was that TMRMC had installed a computer system which only retained the results for a period of 45 days. Some of the supervisors did not realize that the results had to be printed onto hard copy within the 45 day period or they would be lost forever. Therefore, when Mrs. Bass inspected in April, some of the documentation was missing because the section head forgot to run a hard copy of the results prior to 45 day expiration period. Nevertheless, without the documentation, it was impossible to determine whether those controls had been run during the months in question, and thus determine whether adequate quality control was provided.

*i. FAILURE TO INSURE THAT THE ACTUAL RESULTS FOR THE FIBROMETER TIMER AND STOPWATCH WERE RE-CORDED:*

(28) TMRMC did have documentation showing the actual results of the fibrometer timer and stopwatch checks. For some reason unknown to the manager of the TMRMC laboratory, the records apparently were not seen by Mrs. Bass during her inspection. The records were kept at the particular bench where the test was performed, and the manager had no idea why Mrs. Bass did not see them. Had Mrs. Bass asked the laboratory manager for the records, they would have been produced. The records indicate tht the fibrometer time was checked against the stopwatch for ten seconds, with an acceptable variation of plus or minus .3 seconds, and that the stopwatch was checked against the wall clock for thirty seconds with an acceptable variation of plus or minus 1 second. Because TMRMC did document the results of the fibrometer check and the stopwatch check and did provide the acceptable limits on the records that were kept, TMRMC did not have inadequate quality controls.

*j. FAILURE TO INSURE THAT CORRECTIVE ACTION WAS CONSISTENTLY DOCUMENTED WHEN CONTROL RESULTS WERE OUT OF LIMITS.*

(29) The above is the same violation alleged in violation "e". However, this violation refers to the hematology lab, whereas "e" concerns the chemistry lab. On several dates, the controls were outside of the limits, and no documentation was provided to show what corrective action had been taken. On several other dates, there was no

documentation indicating that the controls were run, and therefore there was no way to know if the results were out of limits. For the reasons set forth in the findings of fact for violation "e", TMRMC failed to provide adequate quality control due to its failure to provide appropriate documentation of the action taken.

### k. THE CONSTANT PACKING OF THE MICROHEMATOCRIT-CENTRIFUGE IN THE FAMILY PRACTICE LAB WAS NOT CHECKED QUARTERLY:

(30) This is the same violation as alleged in violation "g", except that this refers to the centrifuge in the family practice lab rather than the centrifuge in the hematology lab. For the reasons set forth in the findings of fact relating to violation "g", TMRMC provided adequate quality control by checking the timer and the speed of the centrifuge monthly.

### CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the subject matter of and the parties to this proceeding. Section 120.57(1), *Florida Statutes*.

Section 483.201(6), *Florida Statutes*, provides that disciplinary action may be taken against a clinical laboratory for "[v]iolating . . . any provisions of this part or the rules promulgated hereunder."

Each of the charges alleged that TMRMC violated Rule 10D-41.33(2), *Florida Administrative Code*. That rules states:

There shall be adequate quality control procedures in effect, including the use of reference and control sera and other biological samples, calibrating standards, and control charts, in all specialities in which the laboratory is registered to perform tests, and appropriate records kept for a period of at least two years.

HRS has no rules or written policies which state specifically what constitutes "adequate quality control procedures".

HRS contends that it applies "federal standards" when doing a state inspection, specifically the standard set forth in Subpart M. HRS asserts that laboratories are on notice that these standards will be used because the language used in Rule 10D-41.33(2) is similar to the language used in Subpart M in 1967, which read:

"There is an adequate quality control program in effect including the use, where applicable, of reference or control sera and other biological samples, concurrent calibrating standards, and control charts recording standard readings."

265

However, the quality control standards of Subpart M were amended in 1974 and 1976, and they no longer contained the above stated language by the time HRS promulgated its rule in 1977. The rule does not incorporate the standards set forth in Subpart M by reference, and those more specific standards cannot be read into the HRS rule simply because HRS used language similar to that which had been in Subpart M prior to its amendment.

When an agency relies upon policy not recorded in its rules, the policy must be established by expert testimony, documentary opinion, or other appropriate evidence. *Florida Medical Center v. Dept. of Health and Rehabilitative Services*, 463 So.2d 380 (Fla. 1st DCA 1985); *Anheuser-Busch, Inc. v. Dept. of Business Regulation*, 393 So.2d 1177 (Fla. 1st DCA 1981). Thus, although the federal regulations cannot be considered to be incorporated into HRS's rule, they may be used as evidence to establish that "adequate quality control procedures" were not in effect.

As to the charges set forth as "a" and "b", there was simply no evidence that the procedure followed by TMRMC violated adequate quality control procedures. Neither the federal standards nor any other authority requires that the RIA background limit be rerecorded each time the daily background level is recorded or that the number of the standards used in calibrating the osmometer must be rerecorded each time the osmometer is calibrated. The evidence did show that TMRMC had established an acceptable background limit, which was recorded in its procedure manual, and that there was sufficient documentation showing that the osmometer was calibrated each day of use with three standards.

HRS failed to prove that adequate quality control procedures were not being followed due to TMRMC's failure to run a control in each run of the extraction portion of the toxi-lab test. Section 405.1317(b)(3)(i) of Subpart M states: "At least one standard and one reference sample (control) shall be included with each run of unknown specimens. . . ." However, the totality of the evidence presented established that the failure to include a control in each run of the extraction process did not result in inadequate quality control. The toxi-lab test is a relatively new test, a control was not even available for the extraction process in 1982, quality control over the extraction portion of the process could be accomplished in part by visual inspection of the extraction tube, and TMRMC followed the manufacturer's recommendation concerning the frequency in which the control should be run. Therefore, TMRMC did not fail to observe adequate quality

266

control by failing to include a control in the extraction portion of each run of the test.

As to charge "d", HRS failed to establish that three levels of controls were required to be run on the blood-gas analyzer on one shift with two levels on each of the other shifts in order for quality control to be observed. However, the evidence did establish that at least one control should be run on each shift, if not two levels, and that TMRMC did not provide sufficient documentation to establish that even one control was being consistently run on one of the shifts. Therefore, TMRMC failed to observe adequate quality control standards in its operation of the blood-gas analyzer.

TMRMC failed to observe adequate quality control procedures as alleged in charges "e" and "j". A failure to indicate what, if any, corrective action was taken when control results were out of limits obviously affects quality control. Running a control serves no purpose if out of limits control results are ignored. Without documentation indicating what was done when out of limits results were obtained, it cannot be determined whether such results were ignored or whether some action was taken.

Rule 10D-41.33(2) specifically requires that records be kept for two (2) years. As alleged in count "f", TMRMC was in violation of the rule because the Quantum drift test records for the two years prior to the inspection were not available at the time of inspection. Indeed, all of the tapes still had not been found at the time of hearing.

The facts alleged as violations "g" and "k" do not establish a failure to observe adequate quality control. TMRMC's procedure of checking the timer and speed of the michrohematocrit centrifuge monthly provided adequate quality control and such was accepted by HRS as adequate in 1982. Therefore, it was unnecessary to check the constant packing of the centrifuge quarterly, and TMRMC did not violate Rule 10D-41.33(2) by its failure to do so.

The evidence established that TMRMC failed to observe adequate quality control by failing to provide documentation to show that FDP controls were run in February and March and that Thrombin controls were run in February, as alleged in charge "h".

TMRMC did have documentation showing that the actual results for the fibrometer timer and stopwatch were recorded. Therefore, TMRMC did not commit the violation alleged in charge "i".

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

**267**

RECOMMENDED that a final order be entered finding that TMRMC violated Rule 10D-41.33(2), *Florida Administrative Code,* as alleged in paragraphs 3(d), (e), (f), (h), and (j), dismissing those charges set forth in paragraphs 3(a), (b), (c), (g), (i) and (k), and imposing a fine of $100 for each violation, a total fine of $500.00.

DONE and ENTERED this 17th day of September, 1986, in Tallahassee, Florida.