# H.C.A. GULF COAST HOSPITAL v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

## Case No. 87-4761

State of Florida, Division of Administrative Hearings

March 11, 1988

### APPEARANCES OF COUNSEL

**Donna H. Stinson, Thomas M. Beason, Moyle, Flanigan, Katz, Fitzgerald & Sheehan** P.A., for petitioner.

**Lee Elzie, Stephen M. Presnell, MacFarlane, Ferguson, Allison & Kelly** for respondent.

### OPINION OF THE COURT

DIANE CLEAVINGER, Hearing Officer.

### *RECOMMENDED ORDER*

This matter came on for hearing in Tallahassee, Florida, before the Division of Administrative Hearings by its duly designated Hearing Officer, Diane Cleavinger, on February 8, 1988. The parties are represented by counsel.

The specific issue addressed in this proceeding is whether there is a numeric need for a cardiac catheterization laboratory at Petitioner's location pursuant to Section 381.705(1)(a), (b), (i), and (l) and 381.705(2)(a), (b), and (d), *Florida Statutes* and Rule 10-5.011(1) (e) 6, 11, 12 and 15, F.A.C. The parties agreed that all other criteria for a cardiac catheterization lab have either been satisfied by the Petitioner or are not applicable in this case.

## PRELIMINARY MATTERS

Bay Memorial Hospital, an existing provider in the Panama City, Florida area, requested, through their counsel, Douglas Sale, to be allowed to present public comments at the hearing pursuant to Section 120.57, F.S., and Rule 22I-6.025, F.A.C. Bay Memorial wished to present an expert who would give his opinion on how the rule should be interpreted. Petitioner objected to allowing such statement since Bay Memorial had not sought intervention under the Division's rules of procedure. The request to participate in the hearing by Bay Memorial was denied since Bay Memorial did not follow the clear rules of the Division regarding intervention.

At the hearing, Petitioner presented the testimony of W. Eugene Nelson and the video tape deposition testimony of Thomas M. Porter and six exhibits. Respondent presented the testimony of Elizabeth Dudeck and three exhibits.

The Division of Administrative Hearings received the transcript of proceedings on March 1, 1988, and the parties filed Proposed Recommended Orders on March 11, 1988. Petitioner's and Respondent's Proposed Findings of Fact have been considered and utilized in the preparation of this Recommended Order except where such proposals were not supported by the weight of the evidence or were immaterial, cumulative or subordinate. Specific rulings on the parties Proposed Findings of Fact are contained in the Appendix to this Recommended Order.

## FINDINGS OF FACT

1. On or about April 13, 1987, Petitioner, H.C.A. Gulf Coast Hospital, submitted its application for a Certificate of Need to operate a cardiac catheterization laboratory in Panama City, Florida. On September 22, 1987, Respondent, Department of Health and Rehabilitative Services (HRS), denied the application because the addition of a sixth cardiac catheterization lab in HRS District 2 would lower the average number of procedures below the 600 procedures required by Rule 10-5.011(1)(e)15, F.A.C. The actual reasoning behind the Letter

of Denial was contained in the State Agency Action Report regarding CON 5121, the project concerned in this case, dated September 9, and 10, 1987. The relevant portions of the State Agency Action Report for purposes of this proceeding are contained on Page 8 and Page 10 of the Report. Petitioner's Composite Exhibit #4. On November 11, 1987, Petitioner requested the Respondent to reconsider its denial of its Certificate of Need for the cardiac catheterization lab. On December 3, 1987, the Respondent upheld its original denial of the Certificate of Need, citing the same rationale it had utilized earlier. Petitioner's Composite Exhibit #5.

2. While pending reconsideration, Petitioner requested that a Section 120.57, F.S., hearing be convened on HRS's denial of Petitioner's CON, and the case was subsequently sent to the Division of Administrative Hearings to conduct the hearing.

### The Hospitals

3. Petitioner is one of two hospitals located in Bay County, Florida. The other hospital and Gulf Coast Hospital's main competitor is Bay Memorial, located about ten minutes away from Petitioner's facility. Both of these hospitals are considered to be in District 2 and specifically in Subdistrict 2A for purposes of HRS CON review. District 2 consists of Bay, Calhoun, Franklin, Gadsen, Gulf, Holmes, Jackson, Jefferson, Leon, Liberty, Madison, Taylor, Washington and Wakulla Counties. See Chapter 10-5, F.A.C.

4. Currently there are no cardiac catheterization facilities at Petitioner's hospital. The only facilities in Bay County are located at Bay Memorial. Bay Memorial has two labs at its facility.

### The Need Criteria

5. All parties agreed that Rule 10-5.011, F.A.C., is the controlling rule in this case. The rule in itself requires a mathematical calculation to arrive at certain need criteria. Rule 10-5.011(1)(e)12, F.A.C. That formula is intended to calculate the number of catheterization procedures expected in a given year in the near future. In this case, the target date was January, 1989. In order to arrive at the expected number of catheterization procedures, the rule requires that one multiply the current number of catheterization procedures which have actually been performed in the applicant's intended service area per 100,000 of population times the projected population for the year service is initiated. The current number of catheterization procedures in District 2 is 3,215. In order to convert that figure to a figure per 100,000 of population, 3,215 must be multiplied by the current base

246

population divided by 100,000. The current base population is 513,825. The first element of the need formula looks as follows: 3215 × 513,825/100,000. This calculation yields a current use criteria of 625.70 catheterization procedures per 100,000 of population.

6. In order to arrive at the number of expected catheterization procedures in January, 1989, for District 2, it is necessary to multiply 625.70 times the projected population for January, 1989. The projected population in the year 1989 for District 2 is 543,518 persons. The calculation is as follows: 625.70 × 543,518/100,000. Based on the above calculations, the Department predicts that there will be 3,401 cardiac catheterizations performed in District 2 in January, 1989, or that there will be a need for 3401 catheterization procedures in January, 1989.

### Too Many Formulas

7. The above need calculation is utilized by the Department to determine whether, under its rule, the applicant will meet the criteria and goals established in its Rule 10-5.011, F.A.C. and obtain the goals set out in Chapter 381, F.S., and relevant local and state health plans. The Department adopted this rule in 1977. For purposes of this case and the issues involved herein, the rule has essentially remained the same since 1977. The relevant portions of Rule 10-D.011 involved in this case are as follows: 10-5.011(1)(e)6 F.A.C.:

> 6. Department Goal. The Department will consider applications for cardiac catheterization laboratories in context with applicable statutory and rule criteria. The Department will not normally approve applications for new cardiac catheterization laboratories in any service area unless additional need is indicated, as calculated by the formula in subparagraph 12, below, and unless the application satisfies the requirements set forth in subparagraph 15, below.

and 10-5.011(1)(e)15.c. F.A.C.:

> Applications proposing to establish cardiac catheterization laboratories will not be approved if they would reduce the average volume of procedures performed by laboratories in the service area below 600 adult procedures and 275 pediatric procedures, based on projected need in the service area.

At the rule's inception in 1977, the HRS staff utilized at least two mathematical formulas to implement Rule 10-5.011(1)(e)15.c F.A.C. The two formulas involved whether the need criteria outlined above should be divided by 600 and then round any resulting fractions to the nearest whole number, or by dividing the need number by the number

of laboratories proposing to operate with no concomitant rounding of resulting fractions. In this case, the number of laboratories proposing to operate for January, 1989, would be six (five existing laboratories, plus the applicant Gulf Coast).

8. The problem with the differing mathematical methodologies do not appear when both results show that there would not be enough future catheterization procedures to warrant an additional laboratory, or conversely that there would be enough procedures to warrant an additional laboratory. The anomaly of the two methodologies arises in the type of case presented here. In this case, the first calculation is represented by the methodology utilized in the State Agency Action Report on page 8. That calculation results in the Respondent concluding that in January, 1989, there is a need in District 2 for six catheterization laboratories, i.e., one additional laboratory than now exists. Gulf Coast, by requesting a Certificate of Need for a catheterization laboratory, has applied for that one additional space. The second mathematical formula is illustrated by the State Agency Action Report on page 10. There, the report concludes that six labs would be too many and divides the estimated need number by six or multiplies six by 600 which essentially yields the same result. In essence, Respondent has concluded there is a need for six labs and then turned around and concluded there is not a need for six labs.

*Past Policy On Inconsistent Formulas And Its Reasons*

9. In either late 1983 or early 1984, these anomalous results were quite appropriately a concern to the Department. At that time, Gene Nelson, Petitioner's expert witness, was the Administrator of the Office of Community Medical Facilities in HRS. His duties entailed the entire oversight of the CON process for catheterization laboratories, including formulating agency policy regarding implementation of its rule on cardiac catheterization. The Department was concerned that it was reaching inconsistent results by utilizing the two mathematical methodologies outlined above and therefore were not treating applicants in a consistent manner. In order to resolve this inconsistent approach, the Department decided upon a policy that the first calculation would control the result of granting or denying an applicant's request. This policy was established in late 1983 or early 1984 and was disseminated verbally through Mr. Nelson's staff. The dissemination may not have been as complete as it should have been given the Agency's policy of not putting anything in writing for fear that it might be challenged as a rule. The policy apparently did not trickle down to Elizabeth Dudeck, who was then a CON applicant analyst under Mr. Nelson. The

248

Department did not stop utilizing the second calculation. However, the second calculation was no longer considered to be the controlling methodology for purposes of granting or denying a CON application. The reason given by both Mr. Nelson and Thomas R. Porter, the then supervisor in the CON program, was to achieve internal consistency among the rules differing provisions and requirements for catheterization laboratory CON review.

10. The differing provisions and requirements involved are Rule 10-5.011(1)(e)9.d., F.A.C.:

d. Minimum Service Volume. In order to assure quality of service, there shall be a minimum of *300* cardiac catheterizations performed annually in any adult cardiac catheterization laboratory *within three years* following its initiation of service. In order to assure quality of service, there shall be a minimum of 150 pediatric cardiac catheterizations performed annually in any laboratory performing pediatric cardiac catheterizations, within three years following its initiation of service. Applicants for either of these services must document that proposed laboratories can meet these minimum volume requirements. (*emphasis added*)

and 10-5.011(1)(3)12, F.A.C.:

12. Need Determination. The need for cardiac catheterization capacity in a service area shall be determined by computing the projected number of cardiac catheterization procedures in the service area. The following formula shall be used in this determination:

$$N_x = U_c \times P_x$$

Where:

$N_x =$ Number of catheterization procedures projected for Year X;

$U_c =$ Actual use rate (number of procedures per hundred thousand population) in the service area for the 12 month period beginning 14 months prior to the Letter of Intent deadline for the batching cycle;

$P_x =$ Projected population in the service area in Year X; and

Year X = The year in which the proposed cardiac catheterization laboratory would initiate service, *but not more than two years* into the future (*emphasis added*)

and Rule 10-5.011(1)(3)15.c., F.A.C., noted earlier. As can be readily seen from the language of the rule, the various provisions listed above have differing time provisions for accomplishing the requirements that the particular rule provision addresses, or does not state any time provisions. The first calculation achieved consistency between these different time requirements by recognizing that a new catheterization

lab would be unlikely to achieve 600 procedures in two years in light of the fact that only 300 procedures are required in three years. Thus, the first calculation allows the time elements to be flexible and more reflective of reality and the startup of a new business. The second calculation does not achieve this flexibility and internal consistency within the rule, and in fact, results in a very rigid rule which in effect presumes that a new lab will achieve 600 procedures in two years, regardless of whether it, in fact, can or desires to do so. Petitioner's application illustrates this point since its plan predicts Petitioner will perform only 325 procedures within three years from start up. In essence, Petitioner's new lab is nearly equal to ½ of a fully functional lab under the expectations of the Department's rule.

11. The Department's original policy was given public recognition in *Lee Memorial Hospital and Ft. Meyers Community Hospital v HRS,* Case Numbers 82-1659 and 83-1518, 6 FALR 6774, (November 19, 194). In that case, the Department specifically rejected a Recommended Order by a DOAH Hearing Officer who utilized the second calculation in recommending denial of the Petitioner's Certificate of Need. As in this case, the Hearing Officer was confronted with the situation where the first calculation recommended approval and the second calculation recommended denial. The Department specifically rejected the second methodology as being controlling and found that the first calculation was the controlling calculation and approved the Certificate of Need for the applicants. Since 1984, numerous other decisions of the department have followed the policy established by Mr. Nelson. See *Humana Inc. v DHRS,* 6 FALR 2874 (1984), *Plantation General Hospital v DHRS,* 6 FALR 6796 (1984), *Humana Inc. v DHRS,* 492 So.2d 388 (Fla. 4th DCA 1986), *Humana Inc. v DHRS,* 469 So.2d 889 (Fla. 1st DCA 1985), *South Sarasota County Memorial Hospital Association, Inc. v DHRS,* 7 FALR 1345 (1985), *Adventist Health Systems/Sunbelt d/b/a Medical Center Hospital v DHRS,* 7 FALR 3500 (1985) and *Lawnwood Regional Medical Center v DHRS,* 9 FALR 2646 (1987). It is clear that Petitioner's CON would be granted under the Department's past policy.

### The New Policy and Its Reasons

12. As noted earlier, during Mr. Nelson's tenure, and Mr. Porter's tenure, Miss Dudeck, the Department's expert witness, was one of the staff personnel who examined CON applications. She was also one of the staff personnel who believed the second mathematical method was the controlling calculation for purposes of CON approval or denial. Sometime after May of 1985, Mr. Dudeck was promoted to occupy the

space once filled by Mr. Porter, i.e., Supervisor in the CON Program. According to Miss Dudeck's testimony, the Department apparently decided to change its policy regarding which mathematical methodology would be controlling in CON approval or denial approximately two years ago. The Department decided, again with nothing written down, that the second mathematical calculation would be the controlling factor in CON review. The only rationale given by the agency at the hearing for its changed course of action was stated by Miss Dudeck to be the result of a change in agency personnel and the fact she thought it was required by the rule. There was no rulemaking engaged in by the agency and no formal written statements or informal memors rendered by the agency. Additionally, there is no credible evidence that there is any established method by which a member of the public could deduce this change in policy.

13. In effect, the Department's change in position has achieved an impossibility by its own rule. On the one hand, the Department is saying six labs are needed in District 2. On the other hand, the Department by another statistic has made that goal impossible to achieve. The Department has established a system where it bases its decision on hypothetical need. The Department then establishes a presumption that all facilities operating will be operating at a level of 600 catheterization procedures within two years. This presumption has absolutely no basis in fact, as was evidence by the continued examples given by all parties where a lab, in fact, would not be operating at either the 600 or the 300 catheterization level within two years, and as was further evidenced by Petitioner's application. Moreover, the Department's original 1984 policy recognized that new businesses do not start at a 600 level, but are only required to achieve a 300 level after three years. When the 600 level is to be achieved is not stated in the rule, nor did anyone seem to know who testified. Similarly, there are no resulting consequences to an operating lab which does not attain the 600 or even the 300 level of procedures. The Department's newest policy clearly does not allow for the other provisions of its Rule and is not consistent with those provisions or Chapter 381, F.S.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and the subject matter of, these proceedings.

2. CON applications by their very nature are complicated and highly dependent on the facts and circumstances of each case. Therein lies the reason Chapter 381, F.S., requires a flexible rule and the weight accorded each criteria will vary, depending on the relevant facts and

circumstances. *Collier Medical Center v HRS,* 462 So.2d 83 (Fla. 1st DCA 1985). See also: *Graham v Estuary Properties, Inc.,* 399 So.2d 1374 (Fla. 1981).

3. Against that background is the desire, if not the right, of an application to be treated in a consistent manner as other applicants by HRS or any agency. Consistency is accomplished through an agency's rules and nonrule policies, and judicial decisions. As stated in *Amos v Department of Health and Rehabilitative Services,* 444 So.2d 43, 47 (Fla. 1st DCA 1983):

> Central to the fairness of administrative proceedings is the right of affected persons to be given the opportunity for adequate and full notice of agency activities. *These persons have the right to locate precedent and have it apply, and the right to know the factual basis and policy reasons for agency action. [Citations omitted.] Inconsistent results based on similar facts without a reasonable explanation violates Section 120.68(12)(b), Florida Statutes, as well as the equal protection guarantees of both the Florida and the United States constitutions. [Citation omitted.]* (Emphasis added)

See *North Miami General Hospital, Inc. v Office of Community Medical Facilities,* 355 So.2d 1272 (Fla. 1st DCA 1978). Simply put, if an applicant is not treated in a consistent manner either under a rule or under nonrule agency policy then the applicant is entitled to know the reason why. *McDonald v Department of Banking and Finance,* 346 So.2d 569 (Fla. 1st DCA 1977); *Florida Cities Water Company v PSC,* 384 So.2d 1280 (Fla. 1980); *Anheuser Busch, Inc. v DBR,* 393 So.2d 1177 (Fla. 1st DCA 1981). The above is particularly true when an agency acts through nonrule policy and, as in this case, elects not to write anything down to memorialize that policy.

4. There is one very important limitation to the agency's ability to act under or change its nonrule policy. The agency's reason for acting under or deviating from its nonrule incipient policy must fall within and be rationally related to the agency's delegated authority. *McDonald supra, Fla. Cities, supra, Anheuser-Busch, supra.*

5. A Section 120.57, F.S. hearing is precisely the statutory mechanism for an agency developing nonrule policy on a case by case basis. In such a hearing the agency has the opportunity to call witnesses, expert or otherwise, to explain its policy choice. However, the accuracy of every factual premise and the reason and rationality of every policy choice must be shown by evidence. *Anheuser-Busch, supra.*

6. The evidence in this case did not demonstrate any rational basis for the change in the Department's policy regarding which mathemati-

cal formula would control the granting or denial of CON applications. The reasons given by Miss Dudeck for the change in policy either do not provide a record foundation for the change of policy or do not fall within the Department's statutorily delegated authority. A change in agency personnel is simply not within or rationally related to the Department's authority under Chapter 381, F.S., and therefore cannot stand as a reason for HRS to change its nonrule policy. Similarly, the reason that "the rule requires" the second calculation provides no record foundation, factual or otherwise, to support the Department's policy change. *Florida Cities, supra.* There must be some evidence which demonstrates how its changed policy meets the rule and statutory requirements and goals of CON applications, and why its changed policy meets those requirements and goals. No evidence was presented on either of these points by the Department.

7. Moreover, the Department's newest policy is not consistent with either Chapter 381, F.S., or Rule 10-5.011, F.A.C. First, the key to Chapter 381, F.S., is flexibility. *HRS v Johnson & Johnson Home Health Care,* 447 So.2d 361 (Fla. 1st DCA 1984). The Department's new policy precludes a balanced consideration of all the statutory and rule criteria by instituting a rigid numerical cutoff. This result is especially compelling since the Department's new policy does not appear to have a basis in reality regarding a new business' ability to achieve the numbers required among the various provisions of the Rule or a new business' desire to perform the number of catheterization procedures a numerical cutoff would suggest. *Johnson & Johnson, supra.* The old policy met this flexibility.

8. On the contrary, the Petitioner did establish its need under HRS' former policy and did present rational reasons for that former nonrule policy. The parties stipulated that the resolution of the need criteria as outlined above was the only factor which mitigated against HRS granting Petitioner's CON application. Petitioner met all other pertinent requirements and met all HRS' requirements, including need under HRS' former policy. Petitioner therefore, met its burden of proof for approval of its CON application.

## RECOMMENDATION

Based on consideration of the foregoing, it is

RECOMMENDED:

That the Department of HRS grant Gulf Coast's application for a Certificate of Need for a new cardiac catheterization service.

DONE and ORDERED this 11th day of March, 1988, in Tallahassee, Florida.